FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2011 JUN -2  P 4: 28

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

|  |  |
|---|---|
| UNITED STATES ex rel.<br>BENJAMIN CARTER, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| HALLIBURTON CO., | ) |
|  | ) |
| KELLOGG BROWN & ROOT SERVICES,<br>INC., | ) |
|  | ) |
| SERVICE EMPLOYEES INTERNATIONAL,<br>INC., | ) |
|  | ) |
| KBR, INC., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

*Filed under seal pursuant*
**to 31 U.S.C. § 3729, *et seq.***

Civil Action No. 1: 11 cv 602

JCC/JFA

### COMPLAINT

1. This action stems from Defendants' fraudulent receipt of payments from the United States Government under the LOGCAP III Contract ("LOGCAP" or "the Contract") for phantom labor and services which were never provided or performed.

2. The Defendants collected LOGCAP payments for the salaries of employees tasked to test and purify water distributed for use by U.S. troops at war in Iraq. Defendants' employees did not perform such services, which Defendants were required to supply under LOGCAP. Although the employees did not perform the services, and Defendants were aware that the employees were not performing such services, the Defendants falsely billed the Government for the cost of such employees' salaries and the performance of such services.

## PARTIES

3. Relator Benjamin was employed by Defendants[1] in Iraq as a Reverse Osmosis Water Purification Unit (ROWPU) Operator. Prior to his employment by Defendants, Mr. Carter had twenty years of experience as a water purification specialist. For five of these years, Mr. Carter owned and operated his own water treatment company in Gunnison, Colorado. Mr. Carter brings this action on behalf of himself and on behalf of the United States.

4. Carter was hired in January 2005 as a Reverse Osmosis Water Purification Unit (ROWPU) Operator to work in Iraq on behalf of the Defendants. He was assigned to work in Iraq, in support of LOGCAP III, on January 13, 2005, and was assigned to Camp Ar Ramadi.

5. Defendant Halliburton Company ("Halliburton") is a publicly-traded company incorporated in Delaware. During much of the time at issue in this Second Amended Complaint, Defendant KBR, Inc. was a wholly-owned subsidiary of Halliburton. Halliburton's CEO has publicized Halliburton's work on LOGCAP in conference calls with investment analysts, referencing LOGCAP III as "our LOGCAP contract" and citing "our [Halliburton's] work" on the contract. Halliburton has extensively publicized its responsibility for services rendered under LOGCAP. According to a transcript of a November 29, 2005 investment analyst call, Halliburton's COO referred to the United States as "our customer" on LOGCAP III. Likewise, on a subsequent January 27, 2006 conference call with analysts, Halliburton's CEO termed the United States the purchasing "customer" of "our work" on LOGCAP III. During times pertinent to this Second Amended Complaint, Halliburton has assisted KBR, Inc. in performing various

---

[1] Mr. Carter's nominal employer was Service Employees International, Inc.; Mr. Carter obtained his employment by responding to a job offer posted on the "KBRJOBS.com" website. Mr. Carter was trained by Halliburton personnel in Houston, Texas prior to departing for Iraq, as described in this Amended Complaint. Additionally, as also described in this Amended Complaint, "Halliburton/KBR" personnel treated Mr. Carter as an employee, and at other times pertinent to this Amended Complaint, as a former employee.

corporate functions, including, without limitation: information technology and communications; human resource services such as payroll and benefit plan administration; legal; tax; accounting; office space and office support; risk management; treasury and corporate finance; and investor services, investor relations and corporate communications. Halliburton has a principal place of business at 5 Houston Center, 1401 McKinney, Houston, TX 77010. Halliburton submitted or caused the submission of the false claims and false statements at issue and otherwise is liable for the claims asserted.

6. Defendant KBR, Inc. is a Delaware corporation registered to do business in the State of Texas. KBR, Inc.: indirectly owns KBRSI and SEII; performs services for them (such as finance and human relations services) that are directly relevant to the misconduct alleged; submitted or caused the submission of the false claims and false statements at issue; and otherwise is liable for the claims asserted. KBR, Inc.'s principal office is located at 601 Jefferson Street, Houston, TX 77002.

7. Defendant[2] Kellogg Brown and Root Services, Inc. ("KBRSI") is a Delaware corporation. Defendant KBR, Inc. is an indirect parent of KBRSI. KBRSI does business at 4100 Clinton Drive, Houston, Texas 77020, and at other locations within this judicial district. It is the awardee of the government contract at issue, the LOGCAP III Contract.[3] KBRSI is a party to the Task Orders 59 and 89 of LOGCAP III at issue in this case. KBRSI submitted or caused the

_____

[2] *See* Relator's Notice of Filing of Second Amended Complaint (Jan. 28, 2009) (addressing the naming of KBRSI as Defendant).

[3] Specifically, it is not the original awardee, but rather a successor. The legal entity that was the original awardee, and its affiliates, have experienced a variety of corporate reorganizations and transformations since the time of award, including an asbestos-related bankruptcy petition, and a well-publicized divestiture by corporate parent Halliburton, Inc. These contortions notwithstanding, the conduct described in this Complaint is fairly attributed to each Defendant, or each Defendant is otherwise liable for it, as specifically alleged.

submission of the false claims and false statements at issue, and is otherwise liable for the claims asserted.

8. Defendant[4] Service Employees International, Inc. ("SEII") is a Cayman Islands corporation. Defendant KBR, Inc. is an indirect parent of SEII. The former parent company of KBR, Inc., i.e., Halliburton, Inc., has identified SEII as a subsidiary in filings with the U.S. Securities and Exchange Commission. On information and belief, SEII does business at 4100 Clinton Drive, Houston, Texas 77020. When Halliburton, KBR, Inc. and KBRSI have hired contract employees for work overseas, they frequently have diverted those employees to employment by SEII. Halliburton and KBR, Inc. treat SEII labor as "subcontract labor" for tax purposes, as reflected in their written statements to federal government auditors. On information and belief, Mr. Carter and many other employees described herein, whose work was billed to the U.S. Government, were SEII employees, at least nominally. SEII has been paid by KBRSI for services rendered by SEII's Reverse Osmosis Water Purification Unit ("ROWPU") employees described below in this Complaint. SEII submitted or caused the submission of the false claims and false statements at issue, and is otherwise liable for the claims asserted.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. §§ 3732(a).

10. Venue is proper in the Eastern District of Virginia under 31 U.S.C. §§ 3732 and 28 U.S.C. §§ 1391(b) and (c) because the defendants reside and transact business in this District.

## ALLEGATIONS

---

[4] *See* Relator's Notice of Filing of Second Amended Complaint (Jan. 28, 2009) (addressing the naming of SEII as Defendant).

## THE LOGCAP CONTRACT

11. Since the early 1990s, the Department of Defense ("DoD") has used logistics support contracts to meet many of its logistical support needs during combat operations, peacekeeping missions, and humanitarian assistance missions. More recently, these contracts have supported contingency operations such as Operation Enduring Freedom (the War in Afghanistan) and Operation Iraqi Freedom. DoD relies on such contracts to provide supplies and services to the military.

12. In 1992, DoD created the Logistics Civil Augmentation Program (LOGCAP) contract as an umbrella support contract to provide all the support services necessary in a conflict. The Army awarded the first LOGCAP contract (LOGCAP I) in 1992 to Halliburton's Kellogg, Brown &Root subsidiary. Support services were provided under LOGCAP I to contingency operations in Haiti, Somalia and the Balkans. In 1997, LOGCAP (LOGCAP II) was awarded to DynCorp Services to continue services in the Balkans. In 2001, LOGCAP III, Contract No. DAAA09-02-D-0007, was awarded to KBRSI's predecessor, Brown& Root Services, Inc., and to non-party Kellogg, Brown &Root, Inc. LOGCAP III has supported contingency operations in Iraq, Kuwait, Afghanistan, Dijbouti, Republic of Georgia, and Uzbekistan.

13. The Defendants have experience staffing the ROWPU position in combat theaters other than Iraq. For example, on dates previous to the Defendants' hiring of Mr. Carter for work in Iraq, Defendants had hired ROWPU Operators to perform water purification services in Afghanistan. The staffing of individuals such as Relator into the position in Iraq, and billing the Government for ROWPU services, was not a new endeavor for Defendants at the time Relator was hired. The concerted, fraudulent methods employed by Defendants to bill the Government

for phantom ROWPU labor in Iraq, described below, were not the result of innocent mistakes made by a rookie contractor.

14. The LOGCAP III Contract is a cost-plus award fee contract. Under LOGCAP III, Task Orders are issued with specific Statements of Work for designated types of work and geographic areas of performance within Iraq.

15. For much of the relevant period, the largest LogCAP III task orders were Task Orders 59 and 89. Under these task orders and the statements of work issued thereunder, KBRSI provided a range of logistics support services. Relator was hired to provide water purification labor services in Iraq on behalf of Defendants, as a ROWPU Operator, pursuant to LogCAP Task Orders 59 and 89.

16. Under LOGCAP, the Government "can terminate, reduce the amount of work, or replace [the LOGCACP] contract with a new competitively bid contract at any time during the term of the contract." See Halliburton Co. 10-Q Securities and Exchange Commission Quarterly Report, Oct. 31, 2005, at 39 (available at http://www.sec.govA.

17. LOGCAP itself bears out this understanding on the part of Halliburton. The Contract incorporates by reference FAR 52.246-5. That FAR provision provides that "[i]f any of the services performed do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, for no additional fee.. .If the Contractor fails to promptly perform the services again or take the action necessary to ensure future performance in conformity with contract requirements, the Government may—...Terminate the contract for default." Id(e)(2).

## WATER PURIFICATION AND TESTING DUTIES

18. KBRSI was obligated under LOGCAP III, LOGCAP III Task Orders 59 and 89,

6

and Statements of Work issued thereunder, to:

> a. Treat (i.e., purify) water distributed for use by U.S. troops at base camps throughout Iraq, including at Ar Ramadi, where Relator was sited for much of his time in Iraq.

> b. Test such water for purity.

> c. Adhere to prescribed environmental standards, including those set forth in Department of Army Technical Bulletin MED 577 ("TB MED 577"), in treating and testing such water.

19. As reflected by a Statement of Work issued under LOGCAP Task Order 59 dated November 14, 2004, KBRSI's specific LOGCAP III contractual duties included, without limitation, "providing], installing], operating] and maintaining] potable and non-potable water systems, to include plumbing, sewage and gray/black water disposal, to facilitate the operation of facilities as directed by the A[dministrative] C[ontracting] O[fficer] (I[n] Accordance] W[ith] applicable Army regulations) and provide on-site storage as needed." Also stipulated under the Statement of Work is KBRSI's duty to "provide, emplace in Life Support Areas and maintain ablution units equipped with environmental control units, showers, mirrors, and sinks (1 head x 20 males and 1head x 15 females) I[n] Accordance] W[ith] base camp populations and as directed by the A[dministrative] Contracting] O[fficer]....[and to] provide, fill, re-fill and maintain non-potable water holding tanks sufficient to store a three-day supply to the ablution units."

20. KBRSI was required to operate and maintain such potable and non-potable water

systems and ablution units both at Ar Ramadi, Iraq, where Relator was sited for much of his time *in Iraq*, and at Al Asad, Iraq, where Relator separately observed Defendants' water purification activities, as further described below.[5]

21. As Mr. Carter was personally aware, an Army regulation denominated as TB MED 577 was an "applicable" regulation, per LOGCAP, to which KBRSI was subject in its discharge of its potable and non-potable water system operation and maintenance duties in Iraq.

22. TB MED 577 sets forth detailed water treatment and testing obligations incumbent upon KBRSI and the Defendants in their implementation of KBRSI's LOGCAP contractual duties. Among those duties were a requirement that water purification personnel, such as the personnel that Defendants hired and assigned to work in Iraq, including Mr. Carter, "[c]onduct tests of raw and product water for chemical agents and radioactivity as necessary."

23. TBMED 577 prescribed purification and testing duties specific to shower water, *i.e.*, water intended for use by troops in their showers. As to such water, "[w]ater storage tanks" were to be used "for treating and storing non-potable fresh water available on site." TB MED 577 further provided that although "water [intended for use by troops] for showers need not meet all of the drinking water standards, [such water] should not impair the health of personnel." Thus, per TBMED 577, KBRSI was required to ensure that such water was "chlorinated to at least a 1 p[arts] p[er] million] chlorine residual" level.[6] KBRSI was obligated to ensure that its ROWPU personnel such as Mr. Carter and his colleagues at Ar Ramadi conducted routine tests

---

[5] Potable water is water that is safe for human drinking purposes. Non-potable water is water that is unsafe to drink in large quantities, but which may be used for purposes such as laundering clothes and showering.

[6] One part per million of "Free Chlorine residual" was thus the minimum allowable amount. There are two types of chlorine residual, free and total chlorine. Free Chlorine indicates an ongoing availability of chlorine to effect disinfection.

of the shower water: "[t]ests for chemical agents and radioactivity will be conducted weekly by *water* purification personnel." Further, KBRSI was required to "[r]ecord from where the water source was procured or supplied" and to "check [shower water]...every 8 hours...[for] chlorine residual [levels]."

24. Other obligations adhered to KBRSI pursuant to TBMED577. KBRSI was required to ensure that shower "wastewater and runoff will be discharged at least 25 yards downstream of the raw water intake."

25. TB MED 577 also required of KBRSI that "[o]pen top tank" water storage Containers "be covered" to prevent contamination.

26. TBMED 577 was updated by the Army in November 2005 and December 2005. The quoted provisions above are from the March 1986 version of the regulation, which immediately preceded the November 2005 version and remained in effect through November 2005. Provisions substantially identical to those cited above are reflected at pages 44, 46, 48, and 49 of the December 2005 version of TB MED 577.

27. In order to perform the water purification and testing services described under LOGCAP III, Task Orders 59 and 89, and the Statements of Work issued thereunder, KBRSI hired water quality specialists such as Mr. Carter to perform the subject duties.

## RELATOR'S HIRING AND TRAINING BY THE DEFENDANTS

28. Mr. Carter initially applied for his position in late November 2004/early December 2004 with the Defendants through the "KBRJOBS.com" website.

29. The ROWPU Operator position was described on that website as one in which Relator would be involved in purifying water distributed for use to U.S. troops. Relator had the

option to specify a preference for work in Afghanistan or Iraq. Relator expressed a first preference for ROWPU work in Afghanistan.

30. Relator filled out employment application paperwork which bore the lettering "Halliburton KBR" in the header.

31. At Defendants' request, Relator signed an "Applicant Personal Information Supplement" bearing the designation "Halliburton Companies" in the header. The opening paragraph of this supplement stated, "In connection with my application for employment with Halliburton Inc. and/or associated companies, I understand that..."

32. Relator received employment application materials via email from a Beth Laxton, "KBR Government Operations." Ms. Laxton's email address bore the suffix '@halliburton.com.'

33. Relator received a call from a Defendant recruiter in early December 2004 offering him a position in Iraq.

34. Prior to embarking for Iraq, Relator received roughly 10days of training at Defendant facilities in Houston, Texas, along with roughly 700 other new employee-trainees. During this training, Defendants' employee-trainers emphasized to Mr. Carter and to the other trainees that their salaries for service in Iraq were paid for by the U.S. Government.

35. Prior to his arrival in Houston, Relator had received a document from the Defendants entitled, "ITINERARY/INFO PACKET CANDIDATE PROCESSING FOR LOGCAP III." This document contained the designation "KBR" in the header.

36. Once at Houston, Mr. Carter and the other trainees received training modules on several subjects, such as "Harassment Briefing," and "Medical Follow-up." Among the training modules was a session lasting one and a half hours entitled "LOGCAP III Project Briefing."

10

37. Relator and the other trainees received extensive framing from Defendants' personnel

in the filling out of timecards to record their labor-hours worked once in Iraq. Defendants'

personnel emphasized the following concerning the timecard process to Mr. Carter and the other

trainees:

> a. That each Defendant employee needed to retain his or her weekly timecard on his
> other person at all times once in Iraq, since Department of Defense auditing
> personnel could appear on site at any moment and ask to see and inspect a given
> Defendant employee's timecard;
>
> b. That the employees' timecards were to be submitted to the Government to secure
> payment for each Defendant employee's salary while in Iraq; and
>
> c. That it was important that the timecards accurately reflect the employee's hours worked
> for each day while in Iraq, since any misrepresentation on a timecard
> could be construed by the United States Government as fraud.

38. At the Houston training, Mr. Carter, along with the other trainees, received a large

binder/manual with the title "LOGCAP III Orientation." The material in this binder emphasized

in exceptional detail that Halliburton/KBR Inc/KBRSI would receive reimbursement from the

Government for the labor services that the trainees were about to provide in Iraq under the

LOGCAP III Contract.

39. In Houston, Mr. Carter received a military identification card that he would carry

with him at all times while in Iraq.

### RELATOR'S ROWPU POSTING IN IRAQ

40. Once in Iraq at Ar Ramadi, Mr. Carter discovered that the Defendants' personnel

required employees such as Mr. Carter to submit fraudulent timecards, on penalty of termination

from employment.

### Al Asad

41. Prior to arrival in Ar Ramadi, Mr. Carter was stationed in Al Asad, Iraq for three days, in mid-January 2005.

42. While in Al Asad, Mr. Carter was given a tour of Defendants' Al Asad ROWPU operations.

43. Comparatively speaking, the scale of Defendants' water processing operations at Al Asad was larger than at Ar Ramadi. At least 10 Defendant employees were nominally staffed as ROWPU employees assigned to the Al Asad site, including an individual named Dale Lehew.

44. Mr. Carter discovered during his tour of the Defendants' Al Asad ROWPU operations that the Defendants' water purification efforts there were a fiction.

45. Mr. Carter personally observed Defendant personnel using rejected drainage water that had cycled through the ROWPU process (i.e., per se highly contaminated water) and re-using such water as a raw input for the production of potable and non-potable water to be distributed for use by U.S. troops at Al Asad.

46. These activities resulted in purported water purification "services" that had no value whatsoever. The TBMED577regulations clearly required "wastewater and runoff...be discharged at least 25 yards downstream of the raw water intake." The Al Asad Defendant employees, including managerial employees, engaged in this activity were aware that their labor "services" had no value whatsoever. Indeed, the "services" had negative value, in that they posed a prima facie and known—or readily knowable—risk of harm to those exposed to the purportedly "purified" water generated at Al Asad by the Defendants.

47. Defendants' ROWPU manager at Al Asad did not even know how to start the Reverse Osmosis Water Purification Unit at Al Asad, and a third country national (i.e., non-U.S. laborer) on site had to demonstrate to him how to start the unit.

12

48. Dale Lehew, who hailed originally from Oklahoma and whose position at Al Asad at the time of Mr. Carter's visit there was ROWPU Operator, had no background in water purification or testing whatsoever. His annualized salary was $84,000.

49. Mr. Carter had witnessed a cavalcade of pretend water purification specialists at "work."

### Ar Ramadi

50. Per Defendant instruction, Mr. Carter traveled from Al Asad to the Junction City camp at Ar Ramadi and commenced work there in mid-January 2005.

51. Upon his arrival, Mr. Carter was told by the Defendant Ar Ramadi ROWPU foreman (Walter Meyers) that both non-potable and potable water at the Ar Ramadi site was being chlorinated and was safe.

52. Mr. Carter was stunned to find that he had no actual water purification or testing duties to perform between mid-January 2005 and early March 2005. He repeatedly requested such work from Meyers, but told that there was no work that needed to be performed.

53. Between January 19, 2005 and late February, 2005, Mr. Carter retained his timecards on his person during the day, as per Defendants' Houston training instructions, until the end of the week.

54. During this time, and over his objections, he was required to fill in timecards stating that he worked 12 hour a day, each day, with uniformity, on ROWPU functions, per instruction of Walter Meyers and per instruction of Defendant Ar Ramadi Chief of Services Warren (Tom) Smith.

55. On these dates, he had actually worked 0 hours per day on ROWPU functions.

13

56. Meyers and Smith were aware that Mr. Carter had actually worked zero hours per day on these dates.

57. Mr. Carter was apprised by Smith that Mr. Carter's timecards were being submitted by Defendants' managerial personnel to the Government.

58. Mr. Carter was threatened with termination by Smith if Carter did not submit the timecards with the requested 12 hour time allocations. Specifically, Smith told Carter that "There are plenty of people back in Houston willing to take your job," if Carter did not go along with the timesheet scheme.

59. There were a total of 3 Defendant ROWPU personnel assigned to Ar Ramadi: foreman Walter Meyers, who had been there since on or about September 1, 2004 in that capacity, Mr. Carter, and, after mid-February 2005, Dale Lehew, who was transferred to Ar Ramadi from Defendants' Al Asad ROWPU operation.

60. The ROWPU personnel were part of a larger group of Defendant employee personnel at Ar Ramadi classified as "Trade" or "Operations and Maintenance" personnel. Other laborers in this category included carpenters and electricians. The total number of employees in this group was 30-40 employees.

61. If any Trade employee's as-submitted time card did not total exactly 12 hours per day and 84hours per week, he or she would be called in to the Operations manager's building over site radio frequency at the end of the work day to change the time card to align with the required 12hr. day/84 hr. week total. This happened to Mr. Carter on several occasions; managerial personnel—principally, Don Mandy and Walter Meyers— would call Mr. Carter's code name over the radio intercom ("Water One") and request that Mr. Carter come to the managerial facility to change his time card.

14

62. The timesheets were printed on 8" x 11"paper, with the paper quality that of standard paper used for computer printouts. The timesheets contained a straightforward grid depicting the days of the week.

63. Meyers repeatedly bragged to Mr. Carter that he (Meyers) was earning a salary of $160,000 per year for his ROWPU foreman "duties."

64. Mr. Carter's annual salary rate was $84,000.

65. Mr. Carter's understanding was that Meyers, as per the routine practice of all other Trade personnel, was also submitting 12 hr. day/84 hr. week timesheets to be submitted to the Government.

66. In late February, the timesheet submission process changed.

67. Mr. Carter was gathered into a room with other Trade personnel and apprised that a government auditor would soon be arriving at the Camp Junction site. Defendant camp management, including Meyers and Smith, did not want to continue submitting both original and amended timesheets to the Government (as had been the case when employees of their own volition initially submitted timesheets that added to something other than 84 hours per week). Per instruction by Meyers and Smith, new timecard submission methods would be employed. Now, each employee would be required to leave his or her timesheets with camp management (as opposed to carrying them around on his or her person). Further, each evening at 7 PM, each employee, including Mr. Carter, would sign a daily timesheet entry in Smith and Meyers' presence.

68. Additionally, Meyers and Smith began requiring all employees, including Mr. Carter, to input their labor-hours worked figures for each Sunday on the Saturday evening before each

Sunday. That way, according to Smith, "You'll get paid on time." Meyers and others would then play Softball on Sunday and bill the 12-hour labor day for Sunday to the Government.

69. This new fraudulent timesheet submission continued in effect from late February 2005 through April 2005, and, upon information and belief, continued during LogCAP performance after Mr. Carter left Iraq (April 2005).

70. The government auditor noted in paragraph 67 did ultimately arrive on site between late February and April 1st. When the auditor did arrive, Defendant Ar Ramadi site management instructed Trade personnel including Mr. Carter to "look busy" and drive around the Ar Ramadi site to create a false appearance of actual work being done.

71. In mid-February 2005, Dale Lehew commenced service as an Ar Ramadi ROWPU Operator, upon transfer from Al Asad.

72. As noted, Mr. Lehew's annualized salary was $84,000.

73. Mr. Carter was instructed by Meyers to personally review Lehew's timesheets to ensure that they were consistent with those of Carter and Meyers (i.e., that Lehew's timesheets also included Active hour tallies).

74. It was not until early March 2005 that Mr. Carter was allowed to inspect the Ar Ramadi Camp Junction base water delivery systems.

75. Mr. Carter was promoted to acting ROWPU foreman when Meyers left the base for the United States on a two-week vacation leave.

76. To that point, no Defendant managerial staff member had provided Mr. Carter

with any Iraq Theatre-wide or Ar Ramadi site-specific set of instructions, policies or procedures, or any other information regarding the operation of the ROWPU or maintaining water quality standards for military and civilian personnel on the base.

77. To that point, Mr. Carter was not aware of the existence of any records reflecting that the Defendants had conducted tests of any kind on non-potable or potable water at Ar Ramadi.

78. None of the equipment that would have been necessary to conduct weekly tests for chemical agents and radioactivity on water to be distributed for use to U.S. troops for showering was on hand or available for Mr. Carter's use.

79. At the threat of being fired, Mr. Carter was required to continue to bill his time to the Government notwithstanding the factual impossibility of his having performed water purification or testing activities.

80. On March 23, 2005, with Meyers on leave and Mr. Carter serving as acting ROWPU foreman, a Defendant Labor Foreman stationed in Ar Ramadi reported to management that he had discovered an organism in the toilet of his living quarters (i.e., vestibule). On inspection, Carter confirmed that a larvae was swimming in the Labor Foreman's toilet bowl.

81. Carter took the initiative to test the running lavoratory water in the employee's bathroom for chlorination. The test results indicated no presence of chlorine.

82. In conducting such tests, Mr. Carter relied on recently acquired spectrophotometers (testing tools).

83. Testing kits that included spectrophotometers for accurately measuring chlorine had never been present at Camp Ramadi until late March 2005. Such tools only arrived at that juncture because Mr. Carter advised Defendant Ar Ramadi Site Manager, Suzanne Raku Williams, that spectrophotometers were an absolutely mandatory tool in order for Defendants to carry out their LOGCAP III/TB MED 577 testing obligations.

84. During his entire time at Ar Ramadi, Relator never observed the presence of tools that would have allowed Defendants to test for chemical agents and/or radioactivity levels in water.

17

85. As a result of Mr. Carter's preliminary tests at the Labor Foreman's vestibule, Mr. Carter determined that the vestibule's lavatory water, including the water from that lavatory's sink and shower, was not fit for human use.

86. Concerned that the entire water system of the base was compromised, Carter suggested to Defendant site managers that the military be notified that their water needed immediate super-chlorinization. He was told by site manager Suzanne Raku-Williams that the military was, quote, "none of" Carter's concern.

87. Among the maladies that untreated water can cause exposed humans are salmonellois, shigellosis, cholera, amebias, giardiasis, and diarrheal disorders.

88. On March 24, 2005, Mr. Carter, at the suggestion of Mo Orr, a Defendant Health, Safety, and Environmental employee, committed his findings to writing in an email directed to Defendant managerial personnel. Mr. Carter sent a three paragraph, 587 word email to Suzanne Raku-Williams (Defendant Ar Ramadi Site Manager), Warren Smith (Chief of Services), Lisa Waterman (Administrative Specialist, O&M Service), and Walter Meyers (ROWPU Foreman, Acting O&M Manager), describing his finding of the toilet larvae and discussing the implications thereof. In his email, Mr. Carter stated, in part, that upon finding the larvae cited in paragraph 80 above, "I then immediately tested the cold water from the.. .sink in [Ross' vestibule] for free chlorine. There was none detected. It had been my understanding that this water was non-potable but was chlorinated."

89. Mr. Carter then tested other locations at which non-potable water was distributed and stored by Defendants at the Ar Ramadi base. These other locations included the Ar Ramadi communications room and the site's main non-potable water storage tanks. His tests at these other locations confirmed that non-potable water at such other locations was also not being

purified. Further, the non-potable water storage tanks, which had an open top structure, were uncovered.

90. Based on the full sum of these test results and the lack of any base testing records of any kind, Mr. Carter concluded that, during Walter Meyers' time as ROWPU foreman from September 1, 2004 through mid-March 2005, Meyers had not been performing any water tests of any kind. Meyers' work was fictive.

91. Mr. Carter then apprised Captain Matthew Hing of his findings. Hing was not aware that the Defendants had been failing to purify or test the non-potable water at Ar Ramadi. Hing had overall responsibilities for medical safety of personnel at the Ar Ramadi base.

92. Based on his conversation with Hing, Mr. Carter concluded that the Defendants had failed to apprise the Government of the ongoing failure to test or treat non-potable water.

93. Within a few days, in late March 2005, a Terrence Copling from Halliburton/KBR[7] Employee/Labor Relations arrived at Camp Junction, apparently assigned to investigate the recent events at Ar Ramadi unrelated to Mr. Carter's water findings.

94. Contemporaneous with the Copling visit, on March 25, 2005, Mo Orr, the Defendant Health, Safety, and Environmental employee noted at paragraph 88 above, resigned in disgust. He stated in his resignation statement that he would no longer work "in an environment where deception and fraud are commonplace." Orr sent this resignation email to David Halliday, Damon Scarborough, Darwin Mixon, Danny Gregory, Jason Walsh, Don Mandy, Jurgen Stringer, Kenneth May, Walter Duvall, and Harry Grocholski (all of whom, upon information and belief, were Defendant employees), and Mr. Carter.

## CARTER'S INVESTIGATORY EFFORTS

---

[7] *See* Footnote 9, *infra.*

95. While Copling was on site, Mr. Carter related his recent water testing and purification and testing findings to Copling.

96. Copling assured Mr. Carter that managerial personnel involved in the Ar Ramadi fraud identified by Mr. Carter would be terminated.

97. Mr. Copling remained on site at Ar Ramadi for approximately 3 days, leaving on or about March 27, 2005.

98. After Mr. Copling left the Ar Ramadi site, Mr. Carter emailed him frequently.

99. Mr. Copling did not return those emails.

100. In April 2005, a Defendant employee named Phillip Daigle, whose title, upon information and belief, was Medic, gave a speech to all Defendant employees at the Ar Ramadi site. Mr. Carter attended this meeting, but was not offered the opportunity to speak at it. The meeting was an all-hands-on-deck safety meeting (one was held every Sunday, on various topics). The subject of this meeting was to address the potential risks associated with the nonpotable water supply at Ar Ramadi. Phillip Daigle purported to offer Defendants' managerial perspective on recent water-related issues at Ar Ramadi. Defendant Ar Ramadi Chief of Services Manager Smith introduced Daigle by stating, "Ben [Carter's] doing a great job with the water situation here and he's got the situation under control." During the speech, Daigle stated that the "only risk" potentially associated with the assembled audience's exposure to non potable water over the months immediately preceding the speech was the risk of exposure to hepatitis.

101. Mr. Carter, out of disgust at the rampant and wanton fraud to which he bore witness, resigned from service to the Defendants, leaving their service in April 2005.

102. During the entire period of Mr. Carter's employment by Defendants, Mr. Carter observed no documentation purporting to reflect that Defendants had actually performed any tests required under the LOGCAP Contract.

103. Relator continued his investigation of Defendants' fraud after leaving Defendants' employ.

104. Mr. Carter contacted Halliburton employee relations representative Janet Little on July 13, 2005 concerning the water testing, purification, and billing issues described in this Amended Complaint.

105. Mr. Carter received an email message from Wil Granger, Defendants' Theater Water Quality Manager for Iraq and Kuwait, on July 21, 2005.

106. Mr. Granger apprised Mr. Carter that Mr. Carter's original whistle-blowing email of March 24, 2005, and his other whistle-blowing activities during that week, did in fact ultimately prompt Defendants to dispatch Granger to evaluate the on-the-ground water testing and treatment conditions at Ar Ramadi. In that July 21, 2005 email, Mr. Granger related that he completed his investigation on May 13, 2005. Mr. Granger further related that he had investigated the extent of documentation at other sites in Iraq that would support the conclusion that Defendants had conducted the water testing required under LOGCAP.

107. As detailed to Mr. Carter by Mr. Granger in that July 21, 2005 email (forwarding earlier emails authored by Granger dated July 15, 2005 and directed to Defendant managerial personnel), Mr. Granger's investigation corroborated Mr. Carter's initial findings.

108. Specifically, Granger found that:

> a. The Defendants had exposed the base camp population at Ar Ramadi to a water source that had not been treated, i.e., purified. The level of water at Ar Ramadi was roughly 2 times the normal contamination level of untreated water from the Euphrates River. Granger's findings concluded that the Ar Ramadi

21

base camp population would have been better off receiving raw water from the Euphrates River as its non-potable water source than the water it had been receiving through May 2005.

b. Granger confirmed in his email that the contamination was believed to have been ongoing through the entire life of the camp, from September 1, 2004 through late May 2005 -a nine month period.

c. Granger further stated that he had yet to find a Defendant-operated installation in Iraq where documentation existed to support the conclusion that the Defendants had performed any of the non-potable shower water testing required under LOGCAP III.

d. Granger additionally stated that he knew of no effort to inform the exposed population at Ar Ramadi of the water problems Granger had identified.

109. Mr. Granger related to Mr. Carter in the July 21, 2005 email that Mr. Granger had sent the results of the above-noted investigation on May 13, 2005 to six members of KBR/Halliburton's senior management team, including KBR/Halliburton's Vice President with overall responsibilities for the LOGCAP III Contract.

110. Janet Little of Halliburton, noted above, referred Mr. Carter to Faith Sproul, Workers' Compensation Manager for Halliburton Company.

111. On July 22, 2005, Mr. Carter sent a 43-word email to Faith Sproul. He asked Sproul "who [he] should contact" regarding the problem presented by contaminated water at Ar Ramadi and at other sites in Iraq. Mr. Carter asked Ms. Sproul if she had "seen the results of William Granger's report about the level of contamination and duration [of contamination] at Ramadi and other sites in Iraq?"

112. Sproul responded via email on that same date and stated that an individual named Chuck Murtoff was the appropriate point of contact, and that Murtoff's position was "Senior Manager for Employee Relations for our Government Operations."

22

113. On the afternoon of August 3, 2005, Mr. Carter was contacted by telephone by Murtoff. During the telephone call, Murtoff stated that Halliburton/KBR had formed a "special investigation team "to look into Mr. Carter's allegations.

114. Upon information and belief, Defendants' formation of this "special investigation team" was prompted by Mr. Carter's July 22, 2005 email to Faith Sproul.

115. The members of the "special investigation team" included the aforementioned Terrence Copling and Defendants' employees Donnie Askew, Jerry Allen, and Vic DeLeque.

116. On August 26, 2005, Mr. Murtoff emailed Mr. Carter to state that "our investigator would like to speak to you regarding your knowledge of the contaminated water incident at B4."[8]

117. According to that August 26, 2005 email, Murtoff's title was Senior Manager, Employee/Labor Relations for"Halliburton/KBR."[9]

118. On August 28, 2005, Donnie Askew, special investigator for Halliburton spoke with Mr. Carter by telephone from Baghdad. Mr. Carter provided answers to all of Askew's questions concerning his knowledge of the water systems operations at Ar Ramadi.

119. On August 29, 2005, Mr. Murtoff emailed Mr. Carter again. He stated that "the company has reached conclusion on the review of the contaminated water issue brought to our attention by yourself..." Mr. Murtoff did not state any specific findings from the review in his email. The email did not note any intention by "Halliburton/KBR" to take any further action in

---

[8] Ar Ramadi is conventionally known by the Government and by Defendants and Defendants' personnel as site"B4."

[9] Mr. Murtoff's employer was reflected as "Halliburton/KBR" (Mr. Murtoff's own words) in email correspondences to Mr. Carter. Such emails contained a signature line authored by Mr. Murtoff stating, verbatim, "Chuck Murtofff,] Halliburton/KBR[,] Sr. Manager Employee/Labor Relations."

connection with the review, either with regard to the subject health risks or the billing of the Government.

120. Based on these email exchanges, including the empty statements by Mr. Murtoff concerning Defendants' "investigation," Mr. Carter concluded that the Defendants had continued to fail to apprise the Government that the Defendants had not been performing the testing and water purification duties noted in this Amended Complaint, *i.e.*, those that they were obligated to perform under LOGCAP; or that Defendants had taken corrective action with regard to the associated false billing.

121. On January 23, 2006, Mr. Carter testified before the Senate Democratic Policy Committee concerning his observations of Defendants' activities in Iraq.

## PHANTOM ROWPU LABOR AT AR RAMADI

122. At varying points in time from September 1, 2004 through May 1, 2005, one (first, solely Meyers),two (Meyers and Carter), and then three (Meyers, Carter, and Lehew) men were nominally staffed by Defendants to water testing and purification duties at Ar Ramadi, Iraq.

123. Meyers repeatedly bragged to Mr. Carter about the level ($160,000 per annum) of his salary as ROWPU Foreman. Meyers came to Ar Ramadi on or about September 1, 2005.

124. Mr. Carter and his ROWPU colleagues at Ar Ramadi received salary payments every two weeks during the subject period.

125. Mr. Carter and his ROWPU colleagues received these salary payments at a Defendant Ar Ramadi Operations office from an employee named Don Mandy. The format of the payment receipts was in an envelope bearing each employee's name. The envelope typically contained a pay stub and cash.

126. Mr. Carter and his colleagues received a portion of their bi-weekly pay from

Defendants in cash, with the remainder of the pay being sent by Defendants via direct deposit to the employee's banking institution of choice in the UnitedStates.

127. Mr. Carter was personally aware that Dale Lehew and Walter Meyers received their salary payments in this fashion.

128. As alleged both *supra* and *infra*, all of the above salaries were billed to and ultimately paid by the Government pursuant to LOGCAPIII.

## PHANTOM ROWPU LABOR AT AL ASAD

129. At least 10 Defendant employees were nominally staffed as ROWPU employees assigned to the Al Asad site.

130. Pursuant to the salary disbursement procedures with which Relator first became personally familiar at his Houston training sessions conducted by the Defendants - including, among other sources, the LOGCAP III Orientation binder distributed during those sessions - upon information and belief, the noted 10+ Al Asad ROWPU employees' time were billed under LOGCAP III, and those employees collected bi-weekly paychecks in a fashion identical to, or substantially identical to, that detailed at paragraphs 124 to 126, above.

131. As alleged, the Al Asad Defendant ROWPU employees were not engaged in any actual water purification duties on discrete dates in January 2005. Upon information and belief, for all dates preceding January 2005 during which such employees were sited at Al Asad, these same ROWPU employees were similarly tasked by the Defendants to labor duties that did not involve water purification or testing. Further, upon information and belief, such diversion of ROWPU labor to tasks that did not support Defendant ROWPU contracting duties continued during LogCAP performance after Mr. Carter left Al Asad.

## PHANTOM ROWPU LABOR AT OTHER SITES IN IRAQ

132. As noted, the Defendants were required by the Government to supply ROWPU services under LOGCAP III at dozens of sites in addition to Ar Ramadi and Al Asad.

133. Byway of example, one other such site was the campsite in Ar Ramadi adjacent to the Camp Junction camp, known as Blue Diamond.

134. Atone point, Mr. Carter asked of Meyers that he be permitted to travel to the Blue Diamond campsite to observe Defendants' ROWPU operations at that site.

135. Meyers denied Mr. Carter the permission to make this visit. Meyers' permission was required in order for Mr. Carter to travel to Blue Diamond, since Mr. Carter would have needed to receive a military pass to make the trip (pursuant to U.S. travel strictures in place in Iraq), even though a short one.

136. The Defendants were obligated under LOGCAP III to supply water purification and testing services for the military at sites throughout Iraq other than Ar Ramadi/Camp Junction and Al Asad.

137. As noted, Defendants' Theater Water Quality Manager for Iraq and Kuwait stated to Carter in July 2005 that he (Granger) had yet to find a Defendant-operated installation in Iraq where documentation existed to support the conclusion that the Defendants had performed any of the non-potable shower water testing required under LOGCAP III.

138. Upon information and belief, the Defendants billed the Government for the labor costs of ROWPU employees staffed at such other sites, notwithstanding that Defendants were aware at the time that they billed the Government for such labor costs that the ROWPU laborers in question had not performed any of the non-potable water testing duties mandated under LOGCAP and described in this Complaint.

### THE LOGCAP CONTRACT: ADDITIONAL BILLING FACTS

*139.* KBRSI submitted LOGCAP bills, including those at issue in this Second Amended Complaint, to officers and employees of the United States Government for payment or approval. KBRSI received payments from the Government for these bills.

140. LogCAP is a cost-reimbursable (specifically, CPAF) contract. LOGCAP contains both a 1% base fee provision, set forth at Section H36 of the contract (a fixed profit percentage applied to actual costs to complete the work), and an award fee provision(a variable profit percentage applied to "definitized" costs, which is subject to the U.S. Government's discretion and tied to the specific performance measures defined in the contract), also set forth at Section H36 of the contract. Base fee revenue is recorded at the time services are performed, based upon actual project costs incurred (including labor), and includes reimbursement for general, administrative, and overhead costs. Per Section H36 of the LOGCAP contract, an award fee is granted periodically by the U.S. Government based on an evaluation of Defendants' performance under the LOGCAP contract as evaluated by a LOGCAP Award Fee Evaluation Board (AFEB).

141. More specifically, the Federal Acquisition Regulation ("FAR"), Title 48 of the Code of Federal Regulations, identifies a cost reimbursement contract as one providing "for payment of allowable incurred costs, to the extent prescribed in the contract." FAR 16.301-1.

142. A CPAF contract pays the contractor not only allowable incurred costs permitted by the contract (as any cost reimbursement contract does), but also "a fee consisting of (a) a base amount . . . , and (b) an award amount, based on a judgmental evaluation by the Government." FAR 16.305; see also FAR 16.405-2.

143. A CPAF contract, unlike a cost-plus-incentive-fee ("CPIF") contract, generally calculates the fee in relation to total allowable costs actually incurred under the contract, not target costs. Thus in a CPAF contract like LogCAP, there is no direct penalty for cost overruns

27

(although the Government may consider cost-effectiveness when determining the award amount).

144. The payment of an award fee, consisting of a base amount plus an award amount, is reflected in the LogCAP Contract, for instance at Contract Line Item Number ("CLIN") 0009, on Page 7 of the LogCAP Contract.

145. Pursuant to LOGCAP contract clause FAR 52.216-7, incorporated into the contract at page 36, KBRSI submits LOGCAP claims for payment "as work progresses." Also per FAR 52.216-7, KBRSI's payment claims include claims for its incurred labor costs, such as the cost of the labor of employees tasked to work on water purification.

146. Section H.36 of the LogCAP Contract provides for a maximum award fee of 3%. The LogCAP base fee is 1% of allowable cost. The "earned" award fee is up to 2% of cost, based on KBR's award fee score, as determined by AFEB. The AFEB evaluates Defendants' performance under LOGCAP as "Excellent," "Very Good," "Good," or "Average," in deciding on an award fee to be tendered to Defendants, pursuant to procedures set forth at Pages 11-17 of Attachment 002 of the contract. As set forth at pages 11 and 12, under LOGCAP, the contractor's receipt of an award fee is contingent on the contractor's receipt of a performance rating of "Good," "Very Good," or "Excellent."

147. As described at page 11 of attachment 2 to the contract, in order to receive its award fee, the LOGCAP contractor must submit to the Government a "written assessment describing its performance" under the contract.

148. In 2006 alone, the Defendants received $120 million in LogCAP award fees.

149. The U.S. Army has awarded the Defendants most, although not all, of LogCAP's 2% "earned" award fee. Both the base fee and the "earned" award fee are calculated on the basis of Defendants' incurred costs.

150. The only constraint on this phenomenon - that Defendants profit from LogCAP waste, fraud and abuse - is when the Defendants gets caught. Getting caught can lead to: the disallowance of costs submitted as allowable costs in LogCAP claims; a reduction in the percentage of the "earned" award fee; a reduction in the fixed base fee; a reduction in the costs found to be allowable under the contract; and the treble damages and penalties recoverable in this action, *inter alia*. These remedial actions can occur, however, only when the Defendants get caught.

151. Since DoD pays Defendants for its LOGCAP work for all costs that the Defendants claim as allowable under the terms of the LOGCAP contract, Defendants have no incentive to minimize its costs of performing its LOGCAP contracting duties.

152. Since the task orders are awarded without competition, the normal constraint that competition imposes on waste, fraud and abuse has been eliminated.

153. The Defendants submit "cost or pricing data" with its task order proposals, to help DoD judge cost realism and reasonableness in the pricing of these task orders.

154. As a result, the Defendants do not even try to economize on LogCAP expenditures. On the contrary, as outlined above, the Defendants consciously endeavor to waste money because higher costs result directly in higher base and award fees.

155. Page 36 of the LogCAP Contract incorporates by reference Federal Acquisition Regulation ("FAR") 52.216-7 ("Allowable Cost and Payment"). Paragraph (a)(1) of FAR 52.216-7 mandates that the contractor

29

> "submit to an authorized representative of the Contracting Officer...
> an invoice or voucher supported by a statement of the claimed
> allowable cost for performing this contract."

FAR52.216-7(a)(l).

156. "Allowable costs" are defined under FAR 52.216-7 as follows:

> For the purpose of reimbursing allowable costs (except as provided in
> paragraph (b)(2) of this clause, with respect to pension, deferred profit sharing,
> and employee stock ownership plan contributions), the term "costs" includes
> only—
>
> > (i) Those recorded costs that, at the time of the request for
> > reimbursement, the Contractor has paid by cash, check, or other form of actual
> > payment for items or services purchased directly for the contract;
> >
> > (ii) When the Contractor is not delinquent in paying costs of contract
> > performance in the ordinary course of business, costs incurred, but
> > not necessarily paid, for—
> >
> > > (A) Supplies and services purchased directly for the contract and
> > > associated financing payments to subcontractors, provided
> > > payments determined due will be made—
> > >
> > > > (1) In accordance with the terms and conditions of a subcontract
> > > > or invoice; and
> > > >
> > > > (2) Ordinarily within 30 days of the submission of the
> > > > Contractor's payment request to the Government;
> > >
> > > (B) Materials issued from the Contractor's inventory and placed in
> > > the production process for use on the contract;
> > > (C) Direct labor;
> > > (D) Direct travel;
> > > (E) Other direct in-house costs; and
> > > (F) Properly allocable and allowable indirect costs, as shown in the
> > > records maintained by the Contractor for purposes of obtaining
> > > reimbursement under Government contracts; and
> >
> > (iii) The amount of financing payments that have been paid by cash,
> > check, or other forms of payment to subcontractors.

FAR 52.216-7(b).

157. KBRSI was required under LOGCAP, at page 32, to submit an invoice form known as "DD Form 250," or its electronic equivalent, to obtain payments from the government.

158. The Government, pursuant to published guidance issued by the Defense Contract Management Agency, requires that contractors report "known deficiencies," including any "unperformed tests" on the Form250 in order to obtain LOGCAP payments from the Government.

159. As enumerated above at, without limitation, paragraphs, 5, 6, and 8, SEII, Halliburton, and KBR, Inc. caused KBRSI to submit payment claims to the Government for the labor of ROWPU employees.

160. Page 1 of the LOGCAP contract provides that payments under the contract will be made by the Defense Finance& Accounting Service ("DFAS"), Rock Island Operating Location, Building 68, Rock Island, Illinois 61299. KBRSI —and any other Defendant with knowledge of this information, are thereby aware that KBRSI's LogCAP claims will be presented to DFAS — at that location. On information and belief, Halliburton, SEII, and KBR, Inc. were aware of this information. Upon information and belief, during the pertinent time period, DFAS further processed KBRSI's LogCAP claims in: Indianapolis, Indiana; Kansas City, Missouri; Cleveland or Columbus, Ohio; and/or Denver, Colorado, *inter alia*.

### First Claim - SCHEME TO SUBMIT FRAUDULENT CLAIMS (FCA § 3729(a)(1))

155. All of the preceding allegations are incorporated herein.

156. KBRSI has submitted LogCAP claims for payment to a variety of U.S. Government offices, as alleged in detail above. Each of these offices is staffed by officers or employees of the United States Government or members of the Armed Forces of the United States. Such KBRSI LogCAP claims have been received by such officers, employees and members.

31

157. KBSRSI knowingly presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

158. Halliburton, KBR, Inc., and SEII knowingly caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

159. As alleged above, during the period between the beginning of the applicable limitations period and the time that this lawsuit is resolved, the Defendants have performed under LogCAP.

160. The Defendants engaged in a scheme to defraud the United States Government into approving or paying false LOGCAP claims.

161. Beginning in or around September 1, 2004, and continuing through April 2005, Defendants knowingly and intentionally presented claims for payment to the United States for the salaries of employees staffed as Ar Ramadi ROWPU personnel, with knowledge that:

> a) Employee Walter Meyers was not engaged in any water testing or purification duties in support of the LOGCAP Contract; and, further, that
>
> b) Employee Benjamin Carter was prevented from engaging in meaningful water testing or purification duties in support of the LOGCAP Contract; and, further, that
>
> c) Employee Dale Lehew was not engaged in any water testing or purification duties in support of the LOGCAP Contract;
>
> d) That Defendants were billing the Government for work that was not actually performed;
>
> e) The Defendants thus tried to get paid for work that they had not actually done.

162. Upon information and belief, these fraudulent submissions continued during

LogCAP performance after Mr. Carter left Iraq; and, absent action by the Court, will continue

during the pendency of this action.

163. Defendants knowingly and intentionally presented claims for payment to the United

States for the salaries of employees staffed as Al Asad ROWPU personnel, for the period of

service of such personnel during January 2005, with knowledge that:

> a) Employee Dale Lehew was not engaged in any water purification duties
> in support of the LOGCAP Contract;
>
> b) That all other 9+ Defendant ROWPU employees were not engaged in any
> water purification duties in support of the LOGCAP Contract; and
>
> c) That Defendants were billing the Government for work that was not
> actually performed;

The Defendants thus endeavored to get paid by the Government for work that they had not

actually done.

164. On information and belief, such false and fraudulent conduct preceded the period of

Mr. Carter's observations of Defendants' Al Asad ROWPU activities; it has continued during

LogCAP performance after Mr. Carter left Al Asad; and, absent action by the Court, it will

continue during the pendency of this action.

165. Upon information and belief, Defendants were also aware that the aforementioned

Al Asad ROWPU employees were not engaging in any water testing duties in support of the

LOGCAP Contract, yet knowingly and intentionally presented claims for payment to the United

States for the salaries of such employees.

166. Commencing after April 1, 2003, and continuing during LogCAP performance after

Mr. Carter left Iraq, Defendants knowingly and intentionally presented claims for payment to the

33

United States for the salaries of employees staffed as ROWPU personnel at sites other than the

Camp Junction Ar Ramadi site and the Al Asad site in Iraq, with knowledge that:

> a) Such personnel were not engaged in any water testing or purification
> duties in support of the LOGCAP Contract; and
>
> b) That Defendants were billing the Government for work that was not
> actually performed;

The Defendants thus endeavored to get paid by the Government for work that they had not

actually done.

167. All such fraudulent claims resulted in:

> a) excessive direct costs (excessive direct labor);
>
> b) resultant excessive indirect cost charges (applied to the excessive or inflated
> direct costs);
>
> c) resultant inflated indirect cost rates; and
>
> d) enhanced "base fee" payments premised upon the unnecessary labor
> components;
>
> e) an enhanced award fee under the contract; and
>
> f) a purposeful avoidance of the LOGCAP Contract penalty provisions,
> including contract termination, as set forth at FAR 52.246-5(e)(2).

167. On information and belief, KBRSI billed the Government under LogCAP for

reimbursement of the labor costs of ROWPU employees during the subject time period at least

once each month, and as often as every two weeks. Each LogCAP invoice submitted from the

beginning of the applicable limitations period in support of this fraudulent scheme and

continuing through the resolution of this lawsuit, was, is and will be a false or fraudulent claim,

for all the reasons alleged above.

## Second Claim - FALSE CLAIMS, OMISSION
## OF REQUIRED INFORMATION (FCA § 3729(a)(1))

168. All of the preceding allegations are incorporated herein.

169. The Government requires that contractors such as Defendants to report "known deficiencies," including any "unperformed tests" on Form 250s or their equivalent in order to obtain LOGCAP payments from the Government.

170. Pursuant to Defense Contract Management Agency guidance, KBRSI was under an obligation to disclose to the Government that it had not performed required non-potable water purification tests at Ar Ramadi, Al Asad, and other sites throughout Iraq, in its DD250 or form equivalent claim submissions to the Government.

171. KBRSI intentionally and willfully omitted this required information in its DD 250 or equivalent form claim submissions to the Government requesting payments from the Government for the salaries of the employees noted in this Complaint, during the time periods noted in this Complaint.

172. Upon information and belief, Halliburton, KBR, Inc., and SEII took affirmative steps to prevent KBRSI from disclosing the required information to the Government in the DD250 or equivalent form claim submissions cited above.

173. In the alternative, Halliburton, KBR, Inc., and SEII willfully and knowingly withheld the required information from KBRSI.

174. The omissions thereby allowed the Defendants to fraudulently collect payments for the ROWPU labor services noted above in this Amended Complaint.

175. The omissions further allowed the Defendants to purposely avoid the LOGCAP contract penalty provisions, including contract termination, specified at FAR52.246-5(e)(2).

176. The omissions thus allowed Defendants to fraudulently collect payments for all other services rendered under LOGCAP separate and apart from ROWPU labor service payments.

177. The omissions further allowed the Defendants to collect a contract award fee larger than that to which they were contractually entitled.

### Third Claim - SUBMISSION OF CLAIMS CONTAINING FALSE EXPRESS OR IMPLIED CERTIFICATIONS (FCA § 3729(a)(1))

178. All of the preceding allegations are incorporated herein.

179. The DD Form 250 contains an express certification that the contractor's performance conforms to the contract.

180. In many cases, especially in recent years, the submission of DD Form 250s has been superseded by the electronic submission of equivalent claims for payment.

181. On information and belief, such electronic substitutes also expressly certify that the contractor's performance conforms to the contract.

182. On information and belief, KBRSI's LogCAP claims for payment contain such certifications.

183. KBRSI billed the Government under LogCAP for reimbursement of the labor costs of ROWPU employees during the subject time period. On information and belief, KBRSI submitted these bills at least once each month, and as often as every two weeks.

184. Each invoice submitted by KBRSI for payment of salary costs of ROWPU employees stationed at Ar Ramadi for periods of labor including, but not limited to, August 2004-April 2005, were unaccompanied and unsupported by true and accurate statements of allowable costs for performance under LOGCAP and were, and are and will be, false or fraudulent claims for their false express certification of compliance with the LOGCAP contract.

KBRSI and the other Defendants thus knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

185. Each invoice submitted by KBRSI for payment of salary costs of ROWPU employees stationed at Al Asad for the periods of labor encompassed by Defendants' fraud, were unaccompanied and unsupported by true and accurate statements of allowable costs for performance under LOGCAP and were, and are and will be, false or fraudulent claims for their false express certification of compliance with the LOGCAP contract. KBRSI and the other Defendants thus knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

186. Each invoice submitted by KBRSI for payment of salary costs of ROWPU employees stationed at camps other than the Ar Ramadi Cam Junction camp and the Al Asad camp for the periods of labor encompassed by Defendants' fraud, were unaccompanied and unsupported by true and accurate statements of allowable costs for performance under LOGCAP. These invoices were, and are and will be, false or fraudulent claims for their false express certification of compliance with the LOGCAP contract. KBRSI and the other Defendants thus knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

187. Regardless of whether the contractor's claim expressly certifies that the contractor's performance conforms to the contract, the submission of the claim constitutes an implied certification that the contractor's performance conforms to the contract.

188. When the contractor's performance does not conform to the contract, this certification is false or fraudulent.

189. Each invoice submitted by KBRSI for payment of salary costs of employees described supra at paragraphs 184 through 186 were unaccompanied and unsupported by true and accurate statements of allowable costs for performance under LOGCAP. These invoices were, and are and will be, false or fraudulent claims for their false implied certification of compliance with the LOGCAP contract. KBRSI and the other Defendants thus knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

## Fourth Claim - FALSE STATEMENTS (FCA § 3729(a)(2))

190. All of the preceding allegations are incorporated herein.

191. Every timesheet submitted by Defendants to the Government in support of the purported cost of labor of ROWPU employees stationed at Ar Ramadi, Iraq for anyone-week time period from September 1, 2004-April 2005 comprised false records or statements and false statements of costs claimed to be allowable under FAR 52.216-7. All such false records or statements were made to the Government to get false or fraudulent claims paid or approved by the Government.

192. Defendants knowingly presented false statements and records to the Government in an effort to get false or fraudulent claims paid or approved by the Government, including, *inter alia*:

> a) Each statement submitted in support of claims for payment of salary costs of ROWPU Foreman Meyers for the period of labor spanning September 1, 2004 through September 5, 2004;

38

b) Each statement submitted in support of claims for payment of salary costs of ROWPU Foreman Meyers for the period of labor spanning September 6, 2004 through September 12, 2004;

c) Each statement submitted in support of claims for payment of salary costs of ROWPU Foreman Meyers for each weekly period of labor dating from September 13, 2004, through May 27, 2005, inclusive;

d) Each statement submitted in support of claims for payment of salary costs of Relator for the period of labor spanning January 19, 2005 through January 23, 2005;

e) Each statement submitted in support of claims for payment of salary costs of Relator for the period of labor spanning January 24, 2005 through January 30, 2005;

f) Each statement submitted in support of claims for payment of salary costs of Relator for each weekly period of labor dating from January 31, 2005, through April 17, 2005, inclusive;

g) Each statement submitted in support of claims for payment of salary costs of ROWPU Operator Lehew for the period of labor spanning February 14, 2005 through February 20, 2005;

h) Each statement submitted in support of claims for payment of salary costs of ROWPU Operator Lehew for the period of labor spanning February 21, 2005 through February 27, 2005;

i) Each statement submitted in support of claims for payment of salary costs of ROWPU Operator Lehew for each weekly period of labor dating from February 28, 2005, through May 27, 2005, inclusive;

j) Each statement submitted in support of claims for payment of salary costs of every Defendant ROWPU Operator, ROWPU Foreman, and other ROWPU personnel in Iraq other than those employees enumerated at sub-paragraphs a) through i) above, whom Defendants knew were factually precluded from performing required LOGCAP testing duties during the period between the beginning of the applicable limitations period and the time that this lawsuit is resolved, for reasons including, but not limited to, Defendants' failure to procure and make available to such personnel water testing equipment necessary for Defendant KBRSI's fulfillment of its duties under the LOGCAP Contract.

193. The Defendants thus knowingly made, used, or caused to be made or used, false

records or statements to get false or fraudulent claims paid or approved by the Government.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following

relief from each of the Defendants, jointly and severally:

A. Three times the amount of damages that the Government sustains because of the

acts of the Defendant;

B. A civil penalty of $11,000 for each violation;

C. An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

D. Award of an amount for reasonable expenses necessarily incurred;

E. Award of the Qui Tam Plaintiffs reasonable attorneys' fees and costs;

F. Interest; and

G. Such further relief as the Court deems just.

## JURY DEMAND

Relator hereby demands trial by jury.

Respectfully submitted,

W. Clifton Holmes
Va. Bar No. 78157
Dunlap, Grubb & Weaver, PLLC
199 Liberty St, SW
Leesburg, VA 20175
703.777.7319
Fax 703.777.3656
cholmes@dglegal.com
Attorney for Relator Benjamin Carter

Dated: June 2, 2011