IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES *ex rel.*<br>BENJAMIN CARTER,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>HALLIBURTON CO.,<br>*et al.*,<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)　UNDER SEAL<br>)<br>)　1:11cv602 (JCC/JFA)<br>)<br>)<br>)<br>)<br>) |

REDACTED

DEC 1 2 2011

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendants
Halliburton Company, KBR, Inc. ("KBR"), Kellogg Brown & Root
Services, Inc. ("KBRSI"), and Service Employees International,
Inc.'s ("SEII") (collectively, "Defendants"), Motion to Dismiss
[Dkt. 11] and Relator Benjamin Carter's ("Relator" or "Carter")
Motion for Leave to File a Sur-reply [Dkt. 29].  For the
following reasons, the Court will grant Defendants' Motion to
Dismiss and deny Relator's Motion for Leave to File a Sur-reply.

### I. Background

#### A.　Carter Action

The subject matter underlying this case is before the
court for a third time and involves the Defendants' alleged
fraudulent billing of the United States.  As set forth below,
this case is identical to two earlier cases dismissed by this

1

Court and related to an earlier case filed in district court in California.

### 1.  Carter's Allegations

In his Complaint, Carter brings a *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 through 3733 (the "FCA"), alleging that Defendants falsely billed the Government for services provided to United States military forces serving in Iraq.

Specifically, Carter alleges that Defendants "knowingly presented [or caused to be presented] to an officer or employee of the United States Government . . . false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).  (Complaint [Dkt. 1] ("Compl.") ¶¶ 157-58.) Carter also alleges that "Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).[1]  (Compl. ¶¶ 192-93.)

These allegations stem from Carter's work as a Reverse Osmosis Water Purification Unit ("ROWPU") Operator in Iraq from mid-January 2005 until April 2005.  (Compl. ¶¶ 3, 41, 69.) During that period, Carter worked at two camps, Al Asad and Ar Ramadi. (Compl. ¶¶ 41-42.)

---

[1] Section 3729(a)(1) has been re-codified at 31 U.S.C. § 3729(a)(1)(A) and section 3729(a)(2) has been re-codified at 31 U.S.C. § 3729(a)(1)(B).

Carter alleges that "the Al Asad Defendant ROWPU employees were not engaged in any actual water purification duties on discrete dates in January 2005," but nevertheless, the "Al Asad ROWPU employees' time [was] billed under LOGCAP[2] III" as if they had been purifying water.  (Compl. ¶¶ 130-31.) Similarly, while working at Ar Ramadi, Carter was allegedly "required to fill in timecards stating that he worked 12 hour[s] a day, each day, with uniformity, on ROWPU functions," though during this time Carter "actually worked 0 hours per day on ROWPU functions."  (Compl. ¶¶ 54-55.)  Carter also alleges that all "trade employees" such as he were required to submit time cards totaling "exactly 12 hours per day and 84 hours per week" and that it was their "routine practice" to do so.  (Compl. ¶¶ 60-61, 65, 67-68.)

In essence, Carter contends that Defendants had knowledge that at the Ar Ramadi and Al Asad camps in Iraq, ROWPU "personnel were not engaged in any water testing or purification duties in support of the LOGCAP Contract," and "Defendants were billing the Government for work that was not actually performed."  (Compl. ¶¶ 163, 166.)

---

[2] As noted in this Court's May 10, 2010 Memorandum Opinion in 1:08cv1162, LOGCAP III was the Logistics Civil Augmentation Program ("LOGCAP") contract put out by the Department of Defense for civil logistical support for military operations in Iraq, Afghanistan, and other countries.

## 2.   Procedural History

### a.   2008 Carter

Carter filed an earlier case in this Court against Defendants, Civil Action No. 08cv1162 (JCC/JFA) ("2008 Carter"). In May 2010, this Court dismissed 2008 Carter without prejudice for lack of jurisdiction.  (1:08cv1162 [Dkt. 307].)  The Court held that 2008 Carter was barred by § 3730(b)(5) of the FCA, which bars a relator from "bring[ing] a related action based on the facts underlying [a] pending action," known colloquially as the FCA's "first-to-file bar."    31 U.S.C. § 3730(b)(5).

Relator filed 2008 Carter on February 1, 2006, in the United States District Court for the Central District of California, with a first amended complaint filed on February 10, 2006.  (1:08cv1162 [Dkt. 5].)  Carter 2008 was transferred to this Court on November 3, 2008.  (1:08cv1162 [Dkt. 73].)  This Court dismissed Carter's first amended complaint in Carter 2008 on January 13, 2009, granting leave to amend.  (1:08cv1162 [Dkt. 90].)  Carter filed a second amended complaint in Carter 2008 on January 28, 2009.  (1:08cv1162 [Dkt. 92].)

Also of significance here is this Court's July 23, 2009 Order in Carter 2008 dismissing Counts 2 and 3 of Relator's second amended complaint in their entirety, dismissing Count 1, alleging that Defendants knowingly submitted false claims to the United States, except as it related to September 1, 2004 through

4

April 2005 for Ar Ramadi, and during January 2005 for Al Asad, (*See* Memorandum Opinion ("Mem. Op.") at 19, 22, 1:08cv1162 [Dkt. 121] (July 23, 2009)), and dismissing Count 4, alleging that Defendants knowingly made or used false records or statements material to a false claim, except as it related to the time cards of the Ar Ramadi ROWPU employees from September 1, 2004 to April 2005, (*id.* at 34)*.*

### b.   California Action

The first-filed "pending action" barring Carter 2008 was *United States ex rel. Thorpe v. Halliburton Co.*, No. 05cv08924 (C.D. Cal.), filed on December 23, 2005 (the "California Action"). (Mem. Op. at 2, 15-19, 1:08cv1162 [Dkt. 306] (May 10, 2010).)

On March 23, 2010, in the week before Carter 2008 was set for trial, the Department of Justice ("DOJ") disclosed to the parties the existence of the California Action. Defendants moved to dismiss Carter 2008 under § 3730(b)(5)'s first-to-file bar, and this Court dismissed Carter 2008 without prejudice on May 10, 2010. (1:08cv1162 [Dkt. 307].)

After this Court dismissed Carter 2008, the California Action was dismissed on July 30, 2010. (Memorandum in Support [Dkt. 16] ("Mem.") at 4)

### c.    2008 Carter Appeal

Relator filed a notice of appeal to the Fourth Circuit on July 13, 2010.  (1:08cv1162 [Dkt. 325].)  Carter moved to dismiss the appeal on December 14, 2010.  (Mem. at 4.)  The Fourth Circuit dismissed the Carter 2008 appeal on February 14, 2011.  (1:08cv1162 [Dkt. 331, 332].)

### d.    2010 Carter

Carter filed a second case in this Court on August 4, 2010, Civil Action No. 10cv864 (JCC/TCB) ("2010 Carter").  The Court dismissed 2010 Carter in May 2011, again holding that the case was barred by the FCA's first-to-file bar.  (Mem. Op. at 10-11, 1:10cv864 [Dkt. 46] (May 24, 2011).)  Specifically, the Court noted that 2010 Carter was filed while the appeal in Carter 2008 -- and, thus, Carter 2008 itself -- was still pending.  (*Id.* at 10.)  Because the two cases were indisputably related, the Court dismissed 2010 Carter without prejudice. (*Id.* at 10-11, 13.)

### e.    The Instant Action

Carter filed this case on June 2, 2011.  [Dkt. 1.] The United States declined to intervene on August 23, 2011. [Dkt. 3.]  This Court unsealed the Complaint on August 24, 2011. [Dkt. 4.]  Carter's complaint in this case is identical to the complaint filed in 2010 Carter and the second amended complaint

6

filed in 2008 Carter, except for its title, case number, and signature block.

On October 21, 2011, Defendants filed a Motion to Dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [Dkt. 11.] In their Motion, Defendants argue, among other things, that this case not only remains barred by the California Action, but is also barred by

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

*United States ex rel. Duprey v. Halliburton, Inc., et al.*, No. 8:07cv1487 (D. Md.) (the "Maryland Action"). ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ Carter filed an opposition to the Motion to Dismiss on November 3, 2011. [Dkt. 21.] Defendants filed their reply in support on November 8, 2011. [Dkt. 25.] Carter filed a Motion for Leave to File a Sur-reply [Dkt. 29] on November 11, 2011, which Defendants opposed [Dkt. 35] on November 16, 2011. Carter filed a reply in support of his Motion for Leave to File a Sur-reply on November 18, 2011. [Dkt. 38.] Defendants' Motion to Dismiss and Carter's Motion for Leave to File a Sur-reply are before the Court.

B.   <u>Maryland Action</u>

The Maryland Action alleges that Defendants "knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)." (Maryland Compl. (Mem. Ex. 4) ¶ 168.)   The Maryland Relators further allege that Defendants "knowingly made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2)."   (Maryland Compl. ¶ 171.)

Since at least March 2003, Defendant KBR provided shipping and transportation support for the United States military in Iraq by operating a division known as the Theater Transportation Mission ("TTM") pursuant to LOGCAP III. (Maryland Compl. ¶¶ 6-7, 19-20.)   The Maryland Relator was employed by Defendant KBR as a truck driver in the TTM division and worked in Iraq from March 27, 2005 to January 15, 2006. (Maryland Compl. ¶¶ 1, 22.)   The Maryland Relator alleges that his section, as well as other sections in the TTM division, inflated the hours on their time cards pursuant to an "unwritten corporate policy" requiring all TTM drivers to enter "no fewer than twelve hours of work per shift" and "to bill a minimum of eighty-four (84) hours per week, notwithstanding the number of hours actually worked."   (Maryland Compl. ¶¶ 23-26.)

8

In support of these allegations, the Maryland Relator specifically claims that, while "[d]ayshift missions typically ended at 1700 hours, rather than the scheduled 1930 hours. . . . it was the regular practice of drivers, convoy commanders, and foremen to include the un-worked balance of the full shift time, up to 1930 hours, on their timesheets, even when completing the shift early." (Maryland Compl. ¶ 44.) Moreover, "most dayshifts included a two (2) hour lunch break which was not deducted from the time sheet," and "drivers would frequently take a two (2) hour breakfast upon arrival at the duty location while 'on-the-clock.'" (Maryland Compl. ¶ 46.) Convoy commanders also allegedly "add[ed] unnecessary hours to the time their crew beg[an] preparations for the mission." (Maryland Compl. ¶ 48.) Similar time card fraud allegedly occurred during night shifts. (Maryland Compl. ¶¶ 71—83). The complaint cites specific examples of truck drivers inflating the hours reported on their time sheets and describes the methods they used to do so. (Maryland Compl. ¶¶ 84-94, 96-101, 102-04, 110, 118-19, 121-30.)

The Maryland Relator alleges "systematic timesheet fraud . . . occurring on a daily basis" throughout the duration of his time in Iraq. (Maryland Compl. ¶ 52.) The Maryland Relator also alleges, based upon information and belief, that "fraudulent timekeeping and billing practices continue to occur

9

to this day." (Maryland Compl. ¶ 60.) Moreover, "because it is KBR's practice to occasionally transfer truck driving staff between Iraq, Kuwait, and Afghanistan, it is the good faith belief of [the Maryland Relator] that these particular fraudulent timekeeping and billing practices are commonplace throughout KBR's operations in Iraq, Kuwait, and Afghanistan." (Maryland Compl. ¶ 61.)



## II. Standard of Review

A. Subject Matter Jurisdiction

Pursuant to Rule 12(b)(1), a claim may be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Defendants may attack subject matter jurisdiction in one of two ways. First, defendants may contend that the complaint fails to allege facts upon which subject matter jurisdiction may be based. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *King v. Riverside Reg'l Med. Ctr.*, 211 F. Supp. 2d 779, 780 (E.D. Va. 2002). In such instances, all facts alleged in the complaint are presumed to be true. *Adams*, 697 F.2d at 1219; *Virginia v. United States*, 926 F. Supp. 537, 540 (E.D. Va. 1995).

Alternatively, defendants may argue that the jurisdictional facts alleged in the complaint are untrue. *Adams*, 697 F.2d at 1219; *King*, 211 F. Supp. 2d at 780. In that situation, "the Court may 'look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Virginia v. United States*, 926 F. Supp. at 540 (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993)); *see also Velasco v. Gov't of Indonesia*, 370 F.3d 393, 398 (4th Cir. 2004) (holding that "the district court may regard the pleadings as mere evidence on the issue and

may consider evidence outside the pleadings without converting the proceeding to one for summary judgment") (citations omitted).

In either circumstance, the burden of proving subject matter jurisdiction falls on the plaintiff. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams*, 697 F.2d at 1219; *Johnson v. Portfolio Recovery Assocs.*, 682 F. Supp. 2d 560, 566 (E.D. Va. 2009) (holding that "having filed this suit and thereby seeking to invoke the jurisdiction of the Court, Plaintiff bears the burden of proving that this Court has subject matter jurisdiction").

### B.   Failure to State a Claim

Rule 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court may dismiss claims based upon dispositive issues of law. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The alleged facts are presumed true, and the complaint should be dismissed only when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.*

In deciding a 12(b)(6) motion, a court must first be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing

13

that the pleader is entitled to relief." Fed. R. Civ. P. 8.
While Rule 8 does not require "detailed factual allegations," a
plaintiff must still provide "more than labels and conclusions"
because "a formulaic recitation of the elements of a cause of
action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
555-56 (2007) (citation omitted).

To survive a 12(b)(6) motion, "a complaint must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'" *Ashcroft v.
Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting
*Twombly*, 550 U.S. at 570). "A claim has facial plausibility
when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Id*. However, "[t]hreadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements, do not suffice" to meet this standard,
*id.*, and a plaintiff's "[f]actual allegations must be enough to
raise a right to relief above the speculative level . . . ."
*Twombly*, 550 U.S. at 555. Moreover, a court "is not bound to
accept as true a legal conclusion couched as a factual
allegation." *Iqbal*, 129 S.Ct. at 1949-50.

### III. Analysis

Defendants argue that this Court should dismiss
Carter's Complaint because the Court lacks jurisdiction under

14

two provisions of the FCA: the FCA's "first-to-file" bar, 31 U.S.C. § 3730(b)(5), (Mem. at 5-13), and the FCA's public disclosure bar,[3] 31 U.S.C. § 3730(e)(4)(A), (Mem. at 16-22). Second, Defendants argue that even if neither jurisdictional bar applies, virtually the entire case must be dismissed due to the FCA's six-year statute of limitations.  (Mem. at 13-16.)

> A.   The First-to-File Bar

Defendants first argue that this case remains barred by the California Action, even though the California Action was dismissed prior to the filing of the instant complaint.[4]  Next, Defendants argue that aside from the California Action, this case is barred under the first-to-file rule ████████████ ████████████ filed in Maryland ████████████████

Section 3730(b)(5) of the FCA is "known colloquially as the Act's first-to-file bar."  *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 (10th Cir. 2004); *Erickson ex rel. United States v. Am. Inst. of Biological Scis.*, 716 F. Supp. 908, 918 (E.D. Va. 1989) (explaining that "this provision establishes a first in time rule").  The text of the first-to-file bar provides that "[w]hen a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending

---

[3] The Court does not address Defendants' public disclosure bar argument because the Court need not reach that issue to dispose of Defendants' Motion to Dismiss.
[4] The Court need not resolve this issue, as it concludes that Carter's action is barred by the Maryland Action discussed herein.

action." 31 U.S.C. § 3730(b)(5). Section 3730(b)(5) is jurisdictional in nature, and if an action based on the facts underlying a pending case comes before the court, a court must dismiss the later-filed case for lack of jurisdiction. *See United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1186-87 (9th Cir. 2001).

### 1. Related Action

The Court is mindful that "[i]n a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Ramey v. Dir., Office of Workers' Comp. Program*, 326 F.3d 474, 476 (4th Cir. 2003) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992)). "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others," and must presume that when Congress writes a statute, it "says . . . what it means and means . . . what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Section 3730(b)(5)'s plain language unambiguously establishes a first-to-file bar, preventing successive Relators from bringing related actions based on the same underlying facts. *See Lujan*, 243 F.3d at 1187. Importantly, Congress

16

drafted the statute to bar all "related actions" not all "identical actions," and thus a subsequent action may differ from a first-to-file action, yet nevertheless be jurisdictionally barred so long as it is considered a "related" action.  *See Grynberg*, 390 F.3d at 1279 (holding that "an identical facts test would be contrary to the plain meaning of the statute, which speaks of 'related' *qui tam* actions, not identical ones.")  Some courts have held that "if the later-filed complaint alleges the same type of wrongdoing as the first, and the first adequately alleges a broad scheme encompassing the time and location of the later filed, the fact that the later complaint describes a different time period or geographic location . . . does not save it from the absolute first-to-file bar of § 3730(b)(5)."  *United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 13 (D.D.C. 2003).

In determining if the actions are "related," courts have adopted slight variations of a common approach: § 3730(b)(5) is an "exception-free" provision that bars subsequently filed actions alleging the "same material elements described in an earlier suit, regardless of whether the allegations incorporate somewhat different details."[5]  *Lujan,* 243 F.3d at 1189.

---

[5] Some Courts have required the same "type of fraud," *see Grynberg,* 390 F.3d at 1280); the same "essential facts," *see United States ex rel. LaCorte v.*

In accordance with this Court's May 10, 2010 Memorandum Opinion in Carter 2008, the Court will apply the test developed in *Erickson ex rel. United States v. American Institute of Biological Sciences*, 716 F. Supp. 908 (E.D. Va. 1989). That is, the Court will find that Carter's suit is barred unless: (1) it is based on facts different from those alleged in the prior suit; and, (2) gives rise to separate and distinct recovery by the government. *See Erickson*, 716 F. Supp. at 918. In determining whether the first-to-file bar applies, the Court looks "at the facts as they existed at the time that action was brought." *Grynberg*, 390 F.3d at 1279.

The Court first examines whether the claims are "based on facts different from those alleged in the prior suit." *Erickson*, 716 F. Supp. at 908. ███████████████ ████████████████████████████████████████ ████████████████████ While the Maryland Action focuses on activities at Camp Anaconda (*see* Maryland Compl. ¶¶ 65-70), the Maryland Relator also alleges that fraudulent timekeeping and billing practices are commonplace throughout KBR's operations in Iraq (*see* Maryland Compl. ¶ 61), thus encompassing

---

*SmithKline Beecham Clinical Labs*, 149 F.3d 227, 232-33 (3rd Cir. 1998)); or the same "material elements of fraud," *see Lujan*, 243 F.3d at 1189).
[6] Carter's complaint also names two other entities defendants -- KBRSI and SEII -- both of which are indirect subsidiaries of KBR. (Compl. ¶¶ 7-8.) Complaints that allege the same material elements of fraud may be deemed related even if they are asserted against different entities within the same corporate structure. *See Grynberg*, 390 F.3d at 1280 n.4; *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218 (D.C. Cir. 2003).

Al Asad and Ar Ramadi.   The Maryland Action also alleges that

time sheet fraud was an "institutionalized" practice known

throughout KBR's corporate structure in Iraq and other

countries.   (Maryland Compl. ¶¶ 163, 165.)   ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

        Following this Court's July 23, 2009 Memorandum

Opinion in 2008 Carter, the scope of Carter's claims has been

narrowed to the submission of fraudulent time sheets between

September 1, 2004 and April 2005 at Ar Ramadi and during January

2005 at Al Asad.   (Mem. Op. at 19, 22, 34, 1:08cv1162 [Dkt.

121] (July 23, 2009).)   The Maryland Relator worked for KBR in

Iraq from March 27, 2005 to January 15, 2006 (Maryland Compl. ¶

1)   █████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████   While most of the Maryland Relator's

employment in Iraq was after the relevant time period in

Carter's case, the Maryland Action also states that KBR provided

support to the United States military in Iraq since at least

March 2003.   (See Maryland Compl. ¶ 19.)   Additionally, the

Maryland Action alleges that Defendants' time sheet fraud had

been "institutionalized" and was rooted in an "unwritten

corporate policy." (*See* Maryland Compl. ¶¶ 24-26, 163, 165.)



*see United States ex rel. Chovanec*, 606 F.3d 361, 364-65 (7th Cir. 2010) (finding complaint alleging fraud in Illinois in 2002 related to complaints alleging fraud in California and Kansas in the 1990s).

"a relator cannot avoid § 3730(b)(5)'s first-to-file by simply adding factual details or geographic locations to the essential or material elements" of the first-filed claims. *United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009).

These allegations certainly provide the Government with knowledge of "the essential facts of a fraudulent scheme" and

"enough information to discover related frauds." *See Branch*,

560 F.3d at 378 (quoting *United States ex rel. LaCorte v.*

*SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d

Cir. 1998)).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████  This Court, however, previously rejected such

a distinction, finding that 2008 Carter was related to the

California Action, notwithstanding the fact that the California

Relators were a carpenter and a plumber.  (Mem. Op. at 4-5, 15-

16, 1:08cv1162 [Dkt. 306] (May 10, 2010).)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████  "This is the 'same type of

wrongdoing,' as seen in Carter's case, albeit across a broader

---

[7] Indeed, as noted in the previous footnote, other courts have found
complaints "related" even when they involve allegations against different
affiliated *entities*.  *See Grynberg*, 390 F.3d at 1280 n.4; *Hampton*, 318 F.3d
at 218.

spectrum of LOGCAP III tasks." (*Id.* (quoting *Lujan*, 243 F.3d at 1188).)

Next the Court examines whether Carter's action "gives rise to separate and distinct recovery by the government." *Erickson*, 716 F. Supp. at 908. The Court notes that the first element of its inquiry, which has been answered affirmatively, is the crucial one. *See Ortega*, 240 F. Supp. 2d at 13. "[A]n examination of possible recovery merely aids in the determination of whether the later-filed complaint alleges a different type of wrongdoing on new and different material facts." *Id.* ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

*See United States v. Apollo Grp., Inc.*, No. 08 CV 1399, 2009 WL 3756623, at *3 (S.D. Cal. Nov. 6, 2009) (finding that the earlier-filed action and later-filed action were based on the same type of wrongdoing, and hence did not allege two different fraudulent schemes that would give rise to separate and distinct recovery).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *See Ortega*, 240 F. Supp. 2d at 13 ("[T]he fact that the later complaint describes a

22

different time period or geographic location that could theoretically lead to a separate recovery does not save it from the absolute first-to-file bar of § 3730(b)(5).") "[S]uch duplicative claims do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *Id.* (quoting *LaCorte*, 149 F.3d at 234). Both elements of the *Erickson* test are therefore satisfied. Accordingly, the Court deems Carter's action related to the Maryland ████████████ within the meaning of § 3730(b)(5).

### 2.   Pending Action

Section 3730(b)(5)'s plain language establishes a first-to-file bar, preventing successive plaintiffs from bringing suit while a related action is "pending." The Maryland Action was filed on June 5, 2007 (Mem. at 11), almost four years before Carter filed the instant complaint on June 2, 2011. The Maryland Action was voluntarily dismissed without prejudice on October 31, 2011, after the Maryland Relator failed to serve his complaint on the defendants. (Opp. at 13 n.15; Reply at 8 n.8.) However, whether a *qui tam* action is barred by § 3730(b)(5) is determined by looking at the facts as they existed when the action was brought. *Grynberg*, 390 F.3d at 1279. It is undisputed that the Maryland Action was pending when Carter

filed the instant suit.  Thus the Maryland Action is deemed
pending for purposes of § 3730(b)(5), and Carter's action is
barred.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████  Having determined that Carter's suit is
barred by the Maryland Action, the Court need not reach the
issue.

     B.   <u>Statute of Limitations</u>

Defendants also argue that Carter's claims are barred
by the statute of limitations.[8]  (Mem. at 13.)  Because Carter
has elected to re-file new actions rather than amend his prior
complaints, Defendants contend that his claims are not subject
to tolling.  (*Id.*)  The FCA provides that a civil action under §
3730 may not be brought "more than 6 years after the date on
which the violation of § 3729 is committed."  31 U.S.C. §
3731(b)(1).[9]  Defendants argue that a violation is committed for

---

[8] The Court's conclusion that Carter's suit is precluded by the first-to-file
bar is, of course, dispositive.  The Court addresses Defendants' statute-of-
limitations argument because, in addition to providing an independent basis
for dismissal of Carter's claims, it bears on whether or not dismissal should
be with prejudice.
[9] Section 3731(b)(2) provides for an alternative three-year limitations period
"after the date when facts material to the right of action are known or
reasonably should have been known by the official of the United States
charged with responsibility to act in the circumstances."  31 U.S.C. §

purposes of § 3731 when the claim for payment is submitted to the Government.[10]  (Mem. at 14.)  Applying the six-year limitations period from the date the false claims were submitted, Defendants contend that Carter's claims are time-barred except as to $673.56 relevant to Count 4, which was included on a public voucher submitted to the Government on June 15, 2005.  (Mem. at 15 & n.9.)  Carter's sole argument[11] in response is that the statute of limitations on all of his claims is tolled by virtue of the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287.[12]  (Opp. at 19.)

---

3731(b)(2).  The Fourth Circuit, however, has held that § 3731(b)(2) extends the statute of limitations beyond six years only in cases in which the United States is a party. *United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 293 (4th Cir. 2008).  Since the United States has elected not to intervene in this case, Carter is bound by the six-year limitations period set forth in § 3731(b)(1).

[10] The Fourth Circuit has not clarified when a violation is deemed to have occurred under § 3731(b)(1).  A majority of courts have concluded that the statute of limitations starts to run when a false claim is submitted to the Government. *See United States ex rel. Dugan v. ADT Sec. Servs., Inc.*, No. DKC 2003-3485, 2009 WL 3232080, at *4 n.2 (D. Md. Sept. 29, 2009) (citing cases).  At least one district court in the Fourth Circuit has held that the statute of limitations is six years from the date of filing a false claim. *See United States v. Shelburne*, No. 09cv00072, 2010 WL 2542054, at *4 (W.D. Va. June 24, 2004).

[11] In a footnote of his proposed sur-reply, and at oral argument, Carter also argued that his claims should be equitably tolled.  For the reasons in Section III.C, *infra*, Carter's Motion for Leave to File a Sur-reply is denied.  In any event, the Court notes that equitable tolling is "reserved for those rare instances where -- due to circumstances external to the party's own conduct -- it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000).  Here, Carter timely filed an identical action -- Carter 2010 -- which was dismissed because he chose to proceed while Carter 2008 was still on appeal, thereby triggering the first-to-file bar.  Thus, Carter cannot show that the instant suit is untimely due to circumstances external to his own conduct, and equitable tolling is inappropriate.

[12] WSLA was reenacted as the Wartime Enforcement of Fraud Act of 2008 ("WEFA"). *See* Wartime Enforcement of Fraud Act of 2008, S. Rep. No. 110-431 (2008).  For ease of reference, the Court refers to the statute as the WSLA, as that is the name used in the parties' briefs and in the case law discussed herein.

1.   <u>Statutory Background</u>

The WSLA was enacted in 1942, and extended the time prosecutors had to bring charges relating to criminal fraud offenses against the United States.   Wartime Enforcement of Fraud Act of 2008, S. Rep. No. 110-431, at 2 (2008).   Prior to October 14, 2008, the WSLA provided that:

> When the United States is at war the running
> of any statute of limitations applicable to
> any offense (1) involving fraud or attempted
> fraud against the United States or any
> agency thereof in any manner . . . shall be
> suspended until three years after the
> termination of hostilities as proclaimed by
> the President or by a concurrent resolution
> of Congress.

18 U.S.C. § 3287 (2008).   On October 14, 2008, the Act was amended to expand its operation to times "[w]hen the United States is at war *or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b))*." 18 U.S.C. § 3287 (2011) (emphasis added).   The amendment also extended the suspension period until "5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress."   *Id.*

Courts are in conflict as to whether the post-amendment WSLA should apply to offenses which occurred before

26

passage of the 2008 amendments.[13]   Courts are also divided as to
whether the pre-amendment WSLA requires a formal declaration of
war or whether the authorized use of military force may also
suffice.[14]   Because the Court concludes that neither the pre-
amendment nor the post-amendment version of the WSLA applies to
Carter's action -- *i.e.*, a non-intervened civil FCA action --
the Court need not decide these issues.

### 2.   Applicability of the WSLA  to Non-Intervened Civil FCA Actions

The issue before the Court is a narrow one: whether
the WSLA applies to civil FCA actions brought by a relator in
which the Government has declined to intervene.   Resolution of
this issue requires the Court to interpret the WSLA --
specifically the meaning of the term "offense."   In keeping with
the principles of statutory construction discussed *supra*, the
Court begins by looking at the plain language of the statute.
At oral argument, Carter argued that the statutory language
clearly applies to civil offenses against the United States,

---

[13] *Compare United States v. Anghaie*, No. 1:09-CR-37, 2011 WL 720044, at *2
(N.D. Fla. Feb. 21, 2011) (applying post-amendment WSLA to counts for which
the limitations period would have expired after the amendment) *with United
States v. W. Titanium, Inc.*, No. 08-CR-4229, 2010 WL 2650224, at *1, 3-4
(S.D. Cal. July 1, 2010) (applying pre-amendment WSLA to offenses that
occurred prior to the amendment) *and United States v. Pearson*, No. 2:09cr43,
2010 WL 3120038, at *1 (S.D. Miss. Aug. 4, 2010) (same)..

[14] *Compare Anghaie*, 2011 WL 720044, at *2 (pre-amendment WSLA requires
congressional declaration of war), *Western Titanium*, 2010 WL 2650224, at *3-4
(same) *and United States v. Shelton*, 816 F. Supp. 1132, 1135 (W.D. Tex.
1993)(Persian Gulf conflict not a "war" within meaning of the WSLA) *with
United States v. Prosperi*, 573 F. Supp. 2d 436, 455-56 (D. Mass. 2008)
(concluding that the United States was "at war" for purposes of the pre-
amendment WSLA during the Afghanistan and Iraq conflicts that began in 2001
and 2002) *and Pearson*, 2010 WL 3120038, at *1-2 (same).

whether the United States is or is not a party.  The Court
disagrees.  The Court need only look at the definition of the
word "offense" to see that Carter is mistaken.  Black's Law
Dictionary defines "offense" as "[a] violation of the law; a
crime, often a minor one."  Black's Law Dictionary 1110 (8th ed.
2004).  The American Heritage Dictionary similarly defines
"offense" as, among other things, "[a] transgression of law; a
crime" and lists "crime" as a synonym.  American Heritage
Dictionary of the English Language 1255 (3d ed. 1992); *see also*
Black's Law Dictionary 1110 ("The terms 'crime,' 'offense,' and
'criminal offense,' are all said to be synonymous, and
ordinarily used interchangeably.") (citing 22 C.J.S. *Criminal
Law* § 3, at 4 (1989)).  Black's includes an entry for the term,
"civil offense," but rather than provide a definition, it cross-
references "public tort."  *Id.* at 1111.  Thus, it is by no means
clear from the statutory language that the term "offense" as
used in the WSLA necessarily includes civil offenses, let alone
non-intervened civil FCA actions.

Defendants argue that the applicability of the WSLA to
the FCA is doubtful, citing *Marzani v. United States*, 168 F.2d
133, 135 (D.C. Cir. 1948), *aff'd by an equally divided Court*,
335 U.S. 895 (1948).  In *Marzani*, a criminal case involving the
false statements clause from the criminal provisions of the

FCA,[15] the D.C. Circuit held that the WSLA "does not apply to offenses under the False Claims Act" -- a conclusion which it believed necessarily followed from Supreme Court precedent. *Marzani* first cited *United States v. Noveck*, 271 U.S. 201 (1926), a case in which the Supreme Court addressed whether the predecessor statute to the WSLA applied to the crime of perjury in an income tax return. The Supreme Court held that it did not, because defrauding the United States is not an element of the crime of perjury. *Noveck*, 271 U.S. at 203-04. Next, *Marzani* cited *United States v. Gilliland*, 312 U.S. 86 (1941), a criminal case which asked whether the FCA is restricted to matters in which the Government has some financial or proprietary interest. The Supreme Court held that defrauding the United States in a pecuniary or financial sense is not a constituent ingredient of FCA offenses. *Gilliland*, 312 U.S. at 93. Based on this line of cases, the D.C. Circuit concluded that since pecuniary fraud is not "an essential ingredient" of offenses under the FCA, the WSLA does not apply. *Marzani*, 168 F.2d at 136. *See also Bridges v. United States*, 346 U.S. 209,

---

[15] The FCA was enacted in 1863 and provided both civil and criminal sanctions for "false, fictitious, or fraudulent" claims submitted to the United States. *See* Act of Mar. 2, 1863, ch. 67, 12 Stat. 696. In 1874, the FCA's civil and criminal provisions were severed, the civil penalties being codified in one section of the United States Code and the criminal provisions in another. *See* U.S. Rev. Stat. tit. 36, § 3490 (1875) (civil); *id.* tit. 70, § 5438 (criminal). In 1982, Congress enacted legislation making the FCA's civil provisions freestanding, without a cross-reference to a criminal statute. *See* Pub. L. No. 97-258, § 3729, 96 Stat. 877, 978 (1982).

222 (1953) (applying similar reasoning to criminal charges involving false statements under oath).

However, in *United States v. Grainger*, 346 U.S. 235, 243 n.14 (1953), also a criminal case, the Supreme Court admonished that references made in cases arising under the false statements clause, such as *Marzani*, should be read as referring to that clause rather than to the false claims clause or the FCA as a whole. Unlike *Marzani*, *Grainger* dealt with the false claims clause, and involved offenses including the making of claims upon the Government for payments induced by knowingly false representations. *Id.* at 242. The Supreme Court noted that this offense included more than the mere making of a false statement, *id.*, and held that the WSLA therefore applied, *id.* at 243.

Here, Carter alleges both false claims (Count 1) and false statements (Count 4). The false statements at issue, however, arise in the civil context and are therefore distinguishable from those in *Marzani*.[16] Defendants' alleged fraud is decidedly pecuniary in nature -- the falsification of

---

[16] Indeed, the false statements clause from the criminal provisions of the FCA, considered in *Marzani*, read as follows: "whoever shall knowingly and willfully . . . make   . . . any false or fraudulent statements or representations . . . in any matter within the jurisdiction of any department or agency of the United States . . . shall be fined not more than $10,000 or imprisoned not more than ten years, or both." 168 F.2d at 135 (citing 18 U.S.C. § 80, now 18 U.S.C. § 1001). Conspicuously absent is a pecuniary element. The false statements clause from the civil provisions of the FCA, relevant here, applies to "any person who knowingly makes, uses, or causes to be made or used, a false record or statement *material to a false or fraudulent claim* [for payment.]" 31 U.S.C. § 3729(b) (emphasis added).

time cards for purposes of fraudulently billing the Government. *Marzani*, by contrast, involved allegations that the defendants had made false statements to government agencies in seeking federal employment and lacked a pecuniary element.  For these reasons, *Marzani* does not compel the conclusion that the WSLA is inapplicable to Carter's false statement claim.  *See United States v. Prosperi*, 573 F. Supp. 2d 436, 441 (D. Mass. 2008) (distinguishing *Marzani* and *Bridges* and holding that the WSLA applied to criminal charges that defendants created false reports in order to procure payment from the Government).

As Carter points out, a handful of out-of-circuit federal trial courts have concluded that the WSLA applies to civil actions brought under the FCA.[17]  In all but one of these cases, however, the United States was the party -- not a relator.  In the lone case brought by a relator and in which the United States declined to intervene, *United States ex rel. McCans v. Armour & Co.*, 146 F. Supp. 546, 550-51 (D.D.C. 1956), the court found that after the 1944 amendment to the WSLA, in which Congress removed the term "now indictable," the statute became applicable to civil actions, including those brought under the FCA.  The court did not distinguish actions brought by relators from actions in which the United States is a party.  As

---

[17] *See, e.g., United States ex rel. McCans v. Armour & Co.*, 146 F. Supp. 546, 550-51 (D.D.C. 1956); *United States v. Temple*, 147 F. Supp. 118, 120-21 (N.D. Ill. 1956); *United States v. Salvatore*, 140 F. Supp. 470, 473 (E.D. Pa. 1956); *Dugan & McNamara, Inc. v. United States*, 127 F. Supp. 801, 803-04 (Ct. Cl. 1955); *United States v. Strange Bros. Hide Co.*, 123 F. Supp. 177, 184 (N.D. Iowa 1954).

it turns out, the court need not have decided the issue at all because the relator exceeded even the WSLA's extended limitations period. *Id.* at 551.

The Fourth Circuit, on the other hand, has distinguished FCA actions in the statute-of-limitations context based on whether or not the United States is a party to the action. *See United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 293 (4th Cir. 2008). Indeed, it is the reasoning in *Sanders* that leads this Court to the conclusion that the WSLA does not apply to non-intervened civil FCA actions. *Sanders* held that 31 U.S.C. § 3731(b)(2) extends the FCA's statute of limitations only in cases in which the United States is a party. 546 F.3d at 293. First, *Sanders* stated that any other reading of the statute would be problematic given that Section 3731(b)(2) refers only to the United States -- and not to relators. *Id.* The WSLA likewise speaks in terms of the United States, and does not mention relators.[18] *See* 18 U.S.C. § 3287 (2011) (referring to offenses involving "fraud or attempted fraud against the *United States or any agency thereof*") (emphasis added).

Second, *Sanders* rejected the relator's argument that the phrase "[a] civil action under section 3730" in the preface to Section 3731(b) includes all civil actions under the FCA."

---

[18] The legislative history surrounding the 2008 amendment also omits reference to relators. *See* S. Rep. No. 110-431. Rather, the legislative history speaks of prosecutors, investigators, and auditors. *See id.* at 2.

546 F.3d at 294. The Fourth Circuit disagreed with the premise that "'a civil action' must be read indiscriminately to encompass all FCA claims in all contexts." *Id.* This Court similarly finds that while the term "offense" in the WSLA *may* include civil actions, it by no means must encompass *all* civil actions.

Third, many of the "practical difficulties" discussed in *Sanders* would arise were the WSLA deemed applicable to non-intervened civil FCA actions. The Fourth Circuit recognized that:

> [Relator's] reading of Section 3731(b)(2)
> . . . would allow relators to sit on their
> claims for up to ten years before filing an
> action and informing the government of the
> material facts. Indeed, relators would have
> a strong financial incentive to allow false
> claims to build up over time before they
> filed, thereby increasing their own
> potential recovery.

*Id.* at 295. In comparison, application of either version of the WSLA to non-intervened civil FCA actions could allow relators to sit on their claims well in excess of ten years. For example, were this Court to take August 31, 2010[19] as the end of the war in Iraq, application of the pre-amendment WSLA to Carter's claims would extend the limitations period to August 31, 2019 -- almost fourteen years after the final fraudulent claims

---

[19] On August 31, 2010, President Obama declared "the end of our combat mission in Iraq" in a nationally televised presidential speech. *See* President Barack Obama, Remarks by the President in Address to the Nation on the End of Combat Operations in Iraq (Aug. 31, 2010), *available at* http://www.whitehouse.gov/the-press-office/2010/08/31/remarks-president-address-nation-end-combat-operations-iraq.

Defendants allegedly submitted to the Government.  The 2008
amendments to the WSLA, which extended the suspension period to
five years, would of course only serve to exacerbate the
problem.

As the Fourth Circuit admonished, "allowing relators
to sit on their claims "would undermine the purpose of the *qui
tam* provisions of the FCA: to combat fraud quickly and
efficiently by encouraging relators to bring actions that the
government cannot or will not -- 'to stimulate actions by
private parties should the prosecuting officers be tardy in
bringing the suits.'" *Id.* (quoting *United States ex rel. Marcus
v. Hess*, 317 U.S. 537, 547 (1943)).  Application of the WSLA as
proposed by Carter would instead allow fraud to extend perhaps
indefinitely.[20]  Moreover, "a relator's failure to notify the
government promptly of FCA violations might also cause the
government to lose out on its ability to bring a criminal fraud
prosecution, which must be filed within five years of the
violation."  *Id.* (citing 18 U.S.C. §§ 287, 3282).  For these
reasons, the Court concludes that the WSLA does not apply to the
instant suit -- that is, a civil FCA action brought by a
relator, in which the United States has opted not to intervene.

---

[20] Indeed, in his proposed sur-reply and during oral argument, Carter asserted
that "war" has yet to conclude within the meaning of the WSLA.  Thus,
according to Carter, the statute of limitations on his claims still hangs in
a state of suspension.

For the foregoing reasons, the Court concludes that Carter's claims are time-barred except for the public voucher for $673.56 relevant to Count 4. Of course, this claim and Carter's complaint as a whole are independently barred by operation of the first-to-file bar. Because the aforementioned public voucher was submitted to the Government on June 2, 2005, it too would be untimely were Carter to again file a new action. And amendment of the complaint would provide no cure to the Court's lack of jurisdiction by virtue of the first-to-file bar. *See United States ex rel. Branch Consultants LLC v. Allstate Ins. Co.*, 782 F. Supp. 2d 248, 267-68 (E.D. La. 2011); *Ortega*, 240 F. Supp. 2d at 14. Accordingly, dismissal is with prejudice.

### C.   Motion for Leave to File Sur-reply

Carter moves to file a sur-reply to respond to "five new arguments" raised in Defendants' reply brief. (Mot. for Leave to File Sur-reply [Dkt. 32] at 1.) These arguments respond to Carter's contention, raised in his opposition brief, that his claims are not barred by the statute of limitations because the limitations period has been suspended by operation of the WSLA.

A court has the discretion to allow a sur-reply where a party brings forth new material or deploys new arguments in a reply brief. *See, e.g., Lewis v. Rumsfeld*, 154 F. Supp. 2d 56,

61 (D.D.C. 2001). Where a party "seeks merely to re-open briefing on the issues raised in [a] motion to dismiss and challenge [the movant's] explanations of cited case law," a sur-reply should not be allowed. *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 467 (D. Md. 2008).

Carter, then, may not submit a sur-reply simply because Defendants used their reply brief to further support an argument made in their opening brief or to respond to new arguments in Carter's opposition. And that is precisely what happened here. Defendants raised the statute of limitations as an issue in their opening brief. Carter then argued, in one brief paragraph, that his claims were not time-barred because of the WSLA. And Defendants responded to that argument in their reply brief. Hence, none of the "new arguments" cited by Carter are truly new. That Carter chose to devote little time to his discussion of the WSLA in his opposition brief does not entitle him to file a sur-reply. Accordingly, the Court will deny Carter's motion.

**IV.  Conclusion**

For these reasons, the Court will grant Defendants' Motion to Dismiss and deny Relator's Motion to File a Sur-reply. This action is dismissed with prejudice.

An appropriate Order will issue.

|                        | _____/s/_____ |
| November 29, 2011      | James C. Cacheris |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE |

37