**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES ex rel. BENJAMIN
CARTER,

                *Plaintiff-Appellant,*

        v.

HALLIBURTON CO.; KELLOGG BROWN
& ROOT SERVICES, INC.; SERVICE
EMPLOYEES INTERNATIONAL, INC.;
KBR, INC.,

                *Defendants-Appellees.*

No. 12-1011

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(1:11-cv-00602-JCC-JFA)

Argued: October 26, 2012

Decided: March 18, 2013

Before AGEE, WYNN, and FLOYD, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Floyd
wrote the majority opinion, in which Judge Wynn joined.
Judge Wynn wrote a separate concurring opinion. Judge Agee
wrote a separate opinion concurring in part and dissenting in
part.

---

## COUNSEL

**ARGUED:** William Clifton Holmes, DUNLAP, GRUBB & WEAVER, PC, Leesburg, Virginia, for Appellant. John Martin Faust, LAW OFFICE OF JOHN M. FAUST, PLLC, Washington, D.C., for Appellees. **ON BRIEF:** Thomas M. Dunlap, David Ludwig, DUNLAP, GRUBB & WEAVER, PC, Leesburg, Virginia, for Appellant. Craig D. Margolis, Tirzah S. Lollar, Kathryn B. Codd, VINSON & ELKINS LLP, Washington, D.C., for Appellees.

---

## OPINION

FLOYD, Circuit Judge:

Appellant Benjamin Carter appeals the district court's dismissal of his complaint with prejudice. The matter was initiated upon Carter's filing of a qui tam lawsuit under the False Claims Act (FCA), 31 U.S.C. § 3729. The subject matter underlying this case involves Appellees'—Halliburton Company; KBR, Inc.; Kellogg Brown & Root Services, Inc.; and Service Employees International, Inc. (collectively KBR)—alleged fraudulent billing of the United States for services provided to the military forces serving in Iraq. The district court concluded that it lacked subject matter jurisdiction over Carter's claims because of the False Claims Act's first-to-file bar, 31 U.S.C. § 3730(b)(5). The district court also held that Carter's complaint had been filed beyond the six-year statute of limitations in the FCA and was not tolled by the Wartime Suspension of Limitations Act (WSLA), 18 U.S.C. § 3287, which the court ruled does not apply to non-intervened qui tam cases. Accordingly, the district court dismissed Carter's complaint with prejudice. Because we conclude that the district court had subject matter jurisdiction and find that the WSLA applies to this action, we reverse. Further, because it may be appropriate for the district court to make

factual findings to consider the public disclosure claim urged by KBR, we remand so the district court can consider this issue.

## I.

In his complaint, Carter brings a qui tam action under the False Claims Act, 31 U.S.C. §§ 3729 through 3733. The FCA allows the United States to bring suit to recover funds and also allows, through the Act's qui tam provisions, for a private plaintiff (relator) to sue in place of the government and keep a share of the proceeds. *See* 31 U.S.C. § 3730(a)-(d). Carter alleges that KBR falsely billed the United States for services performed in Iraq. Specifically, Carter alleges that KBR "knowingly presented to an officer or employee of the United States Government . . . false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)." Carter goes on to allege that KBR "knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

KBR provided logistical services to the United States military in Iraq under a government contract. Carter worked for KBR as a reverse osmosis water purification unit (ROWPU) operator at two camps in Iraq from mid-January 2005 until April 2005. Carter was hired to test and purify water for the troops in Iraq. Carter claims that KBR was in fact not purifying water during the time period but was repeatedly misrepresenting to the United States that it was. Carter submits that water purification did not actually begin until May 2005. Further, Carter maintains that he and his fellow employees were instructed to submit time sheets for twelve-hour days for work that they performed on ROWPU functions. During this time, Carter states that he was actually not working any hours on ROWPU functions. Carter also contends as part of an overall scheme by KBR to overbill the government for labor charges, that all trade employees were required to submit time sheets

totaling exactly twelve hours per day and eighty-four hours per week and that it was "routine practice" of the employees to do so regardless of actual hours worked. As a result, according to Carter, the United States paid KBR for work not actually performed.

Carter filed his original complaint under seal on February 1, 2006, in the United States District Court for the Central District of California. *United States ex rel. Carter v. Halliburton Co.*, No. 06-cv-0616 (C.D. Cal. filed Feb. 1, 2006). After over two years of investigation into the matter, the action was unsealed in May 2008. Shortly thereafter, the case was transferred to the Eastern District of Virginia in October 2008, at which point Carter amended his complaint. *United States ex rel. Carter v. Halliburton Co.*, No. 08-cv-1162 (E.D. Va. filed Feb. 1, 2006). The district court dismissed Carter's first amended complaint without prejudice in January 2009 for failure to plead fraud with particularity. Carter then amended his complaint for a second time and re-filed his complaint in January 2009 (*Carter 2009*). KBR then moved to dismiss Carter's second amended complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, which the district court granted in part. The district court, however, refused to dismiss counts 1 and 4. Count 1 alleged a scheme by KBR to submit fraudulent claims for payment to the government, and count 4 alleged fraudulent statements knowingly made to the government to receive claims for payment. At this point, KBR answered the remaining allegations and the case proceeded through discovery, which closed in March 2010.

In March 2010, one month before the scheduled trial date, the parties were contacted by the United States Department of Justice, who informed them of the existence of a False Claims Act case containing similar allegations filed under seal in December 2005, in the United States District Court for the Central District of California, *United States ex rel. Thorpe v. Halliburton Co.*, No. 05-cv-08924 (C.D. Cal. filed Dec. 23,

2005). *Thorpe* also alleges that KBR's standard operating pro-cedure was billing twelve hours per day, without regard to the actual hours worked to perpetuate a scheme to overbill the government. In April 2010, KBR filed a motion to dismiss *Carter 2009*, arguing that *Thorpe* constituted a "related" action under FCA § 3730(b)(5). In response, Carter argued that *Thorpe* was materially different from his case because he focused on KBR's alleged fraudulent misrepresentation to the government that KBR was actually performing water services for which it was submitting bills.

The district court rejected Carter's characterization, reason-ing that he must show that KBR employees were reporting hours that they did not work and the fact that KBR was not performing water services is merely evidence that the time sheets were false. The district court dismissed *Carter 2009* without prejudice on May 10, 2010. *Carter*, No. 08-cv-1162. Carter appealed the dismissal on July 13, 2010.

Thereafter, the United States District Court for the Central District of California dismissed the *Thorpe* action on July 30, 2010. In response, Carter re-filed his complaint (*Carter 2010*) in the United States District Court for the Eastern District of Virginia while his appeal was still pending. *United States ex rel. Carter v. Halliburton Co.*, No. 10-cv-864 (E.D. Va. filed Aug. 4, 2010). When Carter re-filed his complaint, he also sought to dismiss his appeal in the 2009 action. This Court granted Carter's motion to dismiss his appeal on February 14, 2011. Meanwhile, *Carter 2010* proceeded in the district court and, on May 24, 2011, the district court dismissed Carter's complaint without prejudice, on the grounds that Carter had filed *Carter 2010* while *Carter 2009* was still pending on appeal, thereby creating his own jurisdictional bar under the FCA's first-to-file provision. *Carter*, No. 10-cv-864. Carter chose not to appeal this ruling.

However, Carter re-filed his complaint (*Carter 2011*) on June 2, 2011. *United States ex rel. Carter v. Halliburton Co.*,

No. 11-cv-602 (E.D. Va. filed June 2, 2011). The district court unsealed the complaint on August 24, 2011. The complaint in this case is identical to the earlier 2010 complaint as well the second amended complaint filed in 2009. After the complaint was unsealed, KBR moved to dismiss the action, arguing that the complaint was barred by two related actions, that the case was time barred, and that the case was barred by the public disclosure provision of the FCA.

At the time *Carter 2011* was filed, two allegedly related cases were pending: *United States ex rel. Duprey*, No. 8:07-cv-1487(D. Md. filed June 5, 2007) and another action—that is under seal—filed in Texas in 2007. *Duprey* and the Texas action allege that KBR "knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)." Since at least March 2003, KBR provided shipping and transportation support in Iraq for the United States military. The *Duprey* relator was employed by KBR as a truck driver in Iraq from March 27, 2005, to January 15, 2006. The Texas relators were also truck drivers in Iraq, and at least one relator was present in Iraq during the period of September 2003 to March 15, 2004. Both complaints allege substantially similar claims, namely that KBR had a policy that its drivers enter time sheets reflecting a twelve hour workday and an eighty-four hour work week, without regard to actual hours worked. The relators alleged that this practice was widespread throughout KBR's operations in Iraq and elsewhere. *Duprey* was subsequently voluntarily dismissed in October 2011, and the Texas action was voluntarily dismissed in March 2012.

The district court granted KBR's motion and dismissed the complaint with prejudice on November 29, 2011, ruling that the case was related to *Duprey* and the Texas action. The court also found that *Duprey* was "pending" for purposes of the first-to-file bar, because it had not been dismissed at the time *Carter 2011* was filed. The court considered whether the

Texas action was also "pending" as to bar *Carter 2011*, but ultimately concluded that it need not decide the issue because at least one case—*Duprey*—was pending. The district court also held that *Carter 2011* had been filed beyond the FCA's six-year statute of limitations and would be time barred should it be re-filed. Because of this reason, the court dismissed the case with prejudice. The district court further held that Carter's action was not tolled by the WSLA. The district court held that the WSLA does not apply to claims under the FCA brought by private relators. Finding ample grounds to dismiss the action, the district court did not consider whether the complaint was barred by the public disclosure provision of the FCA. Carter timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo the district court's legal rulings, such as its granting of KBR's motion to dismiss. *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 762 (4th Cir. 2011). To the extent that the decisions below involved legal conclusions based upon factual determinations, we review the factual findings for clear error, viewing the evidence in the light most favorable to Carter. *See id.*

## III.

We first address Carter's contention that the WSLA tolls his action and therefore, that his claims are not time barred under the FCA.

## A.

First, as a general matter, qui tam actions must be brought within six years after the date on which the alleged violation occurred. 31 U.S.C. § 3731(b). The WSLA was enacted in 1942 to extend the time for prosecution to bring charges relating to criminal fraud offenses against the United States during

times of war. Wartime Enforcement Fraud Act of 2008, S. Rep. No. 110-431, at 2. When enacted, the law applied to "offenses involving the defrauding or attempts to defraud the United States . . . and now indictable under any existing statutes." *Dugan & McNamara, Inc. v. United States*, 127 F. Supp. 801, 802 (Ct. Cl. 1955). When amended in 1944, the phrase "now indictable" was deleted. *Id.* at 802. The WSLA was later codified, and is now to be used whenever the country is at war. *Id.*

The Fifth Circuit has determined that the WSLA has three components: "(1) a triggering clause ('When the United States is at war the running of [the applicable statute of limitations] shall be suspended . . . '), (2) a suspension period ('three years'), and (3) a termination clause ('suspended until . . . after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.')." *United States v. Pfluger*, 685 F.3d 481, 483 (5th Cir. 2012) (alterations in original) (quoting 18 U.S.C. § 3287)). The Supreme Court has held that the WSLA applies only to offenses committed after the triggering clause and before the termination of hostilities. *United States v. Smith*, 342 U.S. 225, 262 (1952). The running of the limitations period then begins when hostilities are terminated. *Id.* at 262.

Prior to October 4, 2008, the WSLA provided:

> When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States . . . shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.

18 U.S.C. § 3287 (2006) (current version at 18 U.S.C. § 3287 (2011)). In 2008, the Wartime Enforcement of Fraud Act (WEFA) amended the WSLA to expand its times of operation

to "[w]hen the United States is at war or Congress has enacted specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b))." *See* Wartime Enforcement of Fraud Act, Pub. L. No. 110-417 § 855, *codified at* 18 U.S.C. § 3287. Additionally, the suspension period was extended until "5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." *Id.*

Courts are in disagreement as to which version of the WSLA applies to offenses that occurred before the amendments of 2008. Additionally, courts are in conflict as to whether the pre-amendment WSLA requires a formal declaration of war or whether the authorized use of military force shall suffice.

## B.

Carter contends that the conflict in Iraq in 2005 is sufficient to trigger WSLA's "at war" status under either version of the WSLA. KBR however, urges us not to apply the post-amendment WSLA because it believes that the post-amendment WSLA implicates its constitutional due process rights in that the Act may allow a statute of limitations to run indefinitely.

The question presented is the meaning of "at war" as it appears in the WSLA. As with all questions of statutory construction, we begin by examining the statute's language. "[W]hen a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Ramey v. Dir., Office of Workers' Comp. Program*, 326 F.3d 474, 476 (4th Cir. 2003) (second alteration in original) (quoting *Estate of Cowert v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992)) (internal quotation marks omitted). In interpreting a statute we "must presume that a legislature says in a statute what it means and

means in a statute what it says there." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461-62 (2002).

Although the meaning of "at war" may appear unambiguous at first glance, its meaning in the context of the WSLA is not so clear. As the Supreme Court has noted, "Congress in drafting laws may decide that the Nation may be 'at war' for one purpose, and 'at peace' for another." *Lee v. Madigan*, 358 U.S. 228, 231 (1959). Therefore, we must determine what Congress meant by "at war" in the context of the WSLA.

As an initial matter, we find it unnecessary to decide which version of the WSLA applies because we find that the Act does not require a formal declaration of war. Therefore, under either version of the Act, the United States was at war when the acts at issue occurred. We find that the Act does not require a formal declaration of war for several reasons. First, had Congress intended the phrase "at war" to encompass only declared wars, it could have written the limitation of "declared war" into the Act as it has in numerous statutes. *See, e.g.*, 28 U.S.C. § 2416(d) (tolling provision for civil claims by the United States seeking money damages applies only when "the United States is in a state of war declared pursuant to article I, section 8, of the Constitution of the United States."); 50 U.S.C. § 1829 ("Notwithstanding any other provision of law, the President, through the Attorney General, may authorize physical searches without a court order . . . to acquire foreign intelligence information for a period not to exceed 15 calendar days following a declaration of war by the Congress.").

Next, we believe that requiring a declared war would be an unduly formalistic approach that ignores the realities of today, where the United States engages in massive military campaigns resulting in enormous expense and widespread bloodshed without declaring a formal war. In fact, the United States has not declared war since World War II. However, there have been extensive military engagements in Vietnam, Korea,

Kosovo, Afghanistan, and twice in Iraq. Indeed, the Supreme Court has found that the laws of war apply to non-declared wars, for example the war in Afghanistan. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (holding that the detention of enemy combatants during conflicts is an incident of the rules of war). Surely these circumstances result in situations in which fraud can easily be perpetuated against the United States just as much as a formally declared war. The purpose of the WSLA—to combat fraud at times when the United States may not be able to act as quickly because it is engaged in "war"—would be thwarted were we to find that the United States must be involved in a declared war for the Act to apply. *See generally* Wartime Enforcement Fraud Act of 2008, S. Rep. No. 110-431, at 1-3.

With these principles in mind, we now address the specific conflict in Iraq. On October 11, 2002, Congress authorized the President to use military force to "defend the national security of the United States against the continuing threat posed by Iraq" and "enforce all relevant United Nations Security Council resolutions regarding Iraq." Authorization for the Use of Military Force against Iraq (AUMF), Pub. L. 107–243, 116 Stat. 114 (2002). Although not a formal recognition of war, the AUMF signaled Congress's recognition of the President's power to enter into armed hostilities. Based on the foregoing analysis, we find that the United States was "at war" in Iraq from the date of the AUMF issued by Congress on October 11, 2002.

We now turn to when—and if—the hostilities in Iraq terminated. The Fifth Circuit recently considered this issue in *Pfluger*. 685 F.3d 481. There the court determined that termination clause of the WSLA required compliance with the formal requirements set out in the clause because the language of the clause was plain and unambiguous. *Id.* at 485. We agree. The pre-amendment and post-amendment WSLA both specify that termination shall not occur until the Act's formalities have been met. In the pre-amendment WSLA, termina-

tion occurs when "proclaimed by the President or by a concurrent resolution by Congress." 18 U.S.C. § 3287 (2006). In the post-amendment WSLA, termination happens when "proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." 18 U.S.C. § 3287 (2011). Neither Congress nor the President had met the formal requirements of the Act for terminating the period of suspension when the claims at issue were presented for payment. We therefore conclude that the United States was at war during the relevant time period for purposes of the WSLA.

### C.

KBR next argues that the WSLA does not apply to Carter's claims because the WSLA by its plain terms applies only to criminal cases. KBR bases its argument on the language in the statute that states it applies to "offense[s] involving fraud" and reasons that "offense" ordinarily means only crimes. 18 U.S.C. § 3287. Resolution of this issue requires us to interpret the meaning of "offense" as used in the WSLA.

In *Dugan & McNamara*, 127 F. Supp. at 802-04, the court examined both the legislative history of the Act and the meaning of "offense." The court reasoned that the term "offense" in the 1942 version referred only to criminal penalties. *Id.* However, when amended in 1944, the phrase "now indictable" was deleted. The WSLA was then applicable to all actions involving fraud against the United States. *Id.* at 802 ("The 1942 statute with the phrase 'now indictable' spoke clearly of only criminal offenses. The 1944 enactment deleted that phrase . . . . This deletion leads us to the conclusion that the Suspension Act then became applicable to all actions involving fraud against the United States . . . ."). Further, all but one court, *United States v. Weaver*, 107 F. Supp. 963, 966 (N.D. Ala. 1952), *rev'd on other grounds*, 207 F.2d 796 (5th Cir. 1953), to have considered the issue of whether the WSLA applies to civil claims have found that it applies. *See, e.g.,*

*United States v. Witherspoon*, 211 F.2d 858 (6th Cir. 1954); *United States ex rel. McCans v. Armour & Co.*, 146 F. Supp. 546 (D.D.C. 1956); *United States v. BNP Paribas*, No. H-11-3718, 2012 WL 3234233 (S.D. Tex. Aug. 6, 2012).

Had Congress intended for "offense" to apply only to criminal offenses, it could have done so by not deleting the words "now indictable" or it could have replaced that phrase with similar wording. However, Congress did not include any limiting language and it is our opinion that in failing to do so it chose for the Act to apply to all offenses involving fraud against the United States. Therefore, because we find the text of the WSLA, the 1944 amendments, and the legislative history persuasive, we find that the WSLA applies to civil claims.

## D.

The district court found that even if the WSLA was applicable to civil cases, it remains inapplicable to actions where the United States is not a party. The district court relied on this Court's decision in *United States ex rel. Sanders v. North American Bus Industries Inc.*, 546 F.3d 288 (4th Cir. 2008), for support that the WSLA includes actions brought only by the United States. This Court held in *Sanders* that 31 U.S.C. § 3731(b)(2), a special statutory extension of the FCA's statute of limitations, was available only to the government. *Id.* at 593. *Sanders*'s reasoning is further supported by the fact that the FCA has a statute of limitations that applies specifically to relators. 31 U.S.C. § 3731(b)(1). The limitations period in § 3731(b)(2) starts when the government knows or should know of "facts material to the right of action." *Sanders*, 546 F.3d at 294 (quoting § 3731(b)(2)). The court reasoned:

This language makes perfect sense when referring to an action brought by the government: the limitations period is based on the government's knowledge of

> 'facts material to the right of action' because that particular knowledge notifies the government that it has an actionable FCA claim. But applying the statute's language to a relator's action makes no sense whatsoever.

*Id.* at 294 (quoting § 3731(b)(2)). Unlike in *Sanders*, whether the suit is brought by the United States or a relator is irrelevant to this case because the suspension of limitations in the WSLA depends upon whether the country is at war and not who brings the case. As such the district court's reliance on *Sanders* was misguided.

Courts are "authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress." *Murkeldove v. Astrue*, 635 F.3d 784, 793 (4th Cir. 2011) (quoting *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 451 (5th Cir. 2008)) (internal quotation marks omitted). *Sanders* follows this logic, but this principle does not exclude relator-initiated actions from the ambit of the WSLA. Including such actions does not lead to "absurd results" nor "defeat the intent of Congress." *See id.* In fact, including civil claims furthers the WSLA's purpose: to root out fraud against the United States during times of war. *See generally* Wartime Enforcement Fraud Act of 2008, S. Rep. No. 110-431, at 2-5. The district court's reasoning for relying on *Sanders* was that if the WSLA applied to a relator's claims this would "allow fraud [claims] to extend perhaps indefinitely." This is incorrect. The WSLA tolls the applicable period for a specified and bounded time while the country is at war. By offering this rationale, it appears the court was critiquing the purpose of the WSLA itself and not providing a valid basis for excluding relator-initiated claims from the WSLA. Accordingly, we are unpersuaded that relator-initiated claims are excluded from the ambit of the WSLA. Thus, Carter's action is not time barred.

IV.

We next consider KBR's argument that the FCA's first-to-file bar prohibits Carter's case from proceeding.

A.

The FCA prescribes penalties for claims submitted to the government that are known to be false. While encouraging citizens to act as whistleblowers, the Act also seeks to prevent parasitic lawsuits based on previously disclosed fraud. *See United States ex rel. St. John LaCorte v. Smith-Kline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 233 (3d Cir. 1998). To reconcile these conflicting goals, the FCA has placed jurisdictional limits on its qui tam provisions, including § 3730(b)(5)'s first-to-file bar and § 3730(e)(4)'s public disclosure provision.

Under the first-to-file bar, if Carter's claims had been previously filed by another relator, then the district court lacked subject matter jurisdiction. By the same token, the public disclosure bar prevents a relator from bringing an action if the matters therein have already been made public knowledge, except if the person is an original source of the information. Although the provisions promote the same goals, they have different requirements. Here the district court ruled on the first-to-file bar and did not consider the public disclosure bar. Because of this, we begin with the first-to-file bar.

B.

KBR argues that *Duprey* and the Texas action are related actions that deprive this Court of jurisdiction under the first-to-file bar. This Court has described the first-to-file bar as an absolute, unambiguous exception-free rule. *See United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999). Therefore, whoever wins the race to the courthouse prevails and the other case must be dismissed. The text of the relevant

section provides that "[w]hen a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). Section 3730(b)(5) is jurisdictional and if an action is later filed that is based on the facts underlying the pending case, the court must dismiss the later case for lack of jurisdiction. *See Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005).

In determining whether a complaint is similar enough as to be caught by the first-to-file bar, courts have applied variations of a common approach. Although the approaches vary, courts have almost uniformly rejected an "identical facts" test on the ground that the provision refers to a "related" action rather than an "identical" action. The courts also agree that differences in specifics—such as geographic location or added facts—will not save a subsequent case. The Third, Fifth, Sixth, Ninth, Tenth, and D.C. circuits have all adopted a "same material elements test." *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1183 (9th Cir. 2011); *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009); *Walburn*, 431 F.3d at 971; *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279-1280 (10th Cir. 2004); *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217-218 (D.C. Cir. 2003); *LaCorte*, 149 F.3d at 232-33.

Under this test, a later suit is barred if it is based upon the "same material elements of fraud" as the earlier suit, even though the subsequent suit may "incorporate somewhat different details." *Lujan*, 243 F.3d at 1189. "[T]he test prevents the less vigilant whistle-blower from using insignificant factual variations to allege what is essentially the same fraudulent scheme already made known to the government." *United States ex rel. Folliard v. Synnex Corp.*, 798 F. Supp. 2d 66, 73 (D.D.C. 2011) (quoting *United States ex rel. Batiste v. SLM Corp.*, 740 F. Supp. 2d 98, 102 (D.D.C. 2010)) (internal

quotation marks omitted). We find our sister circuits' reasoning persuasive, and we join these circuits in adopting the "material elements test."

### C.

We shall now apply the material elements test to determine whether Carter's action is barred by either *Duprey* or the Texas action. The allegations in *Duprey*, the Texas action, and herein are substantially similar. All allege that KBR had a systematic practice of overbilling the government for hours worked by their employees. The employees were instructed to complete their time sheets without regard to the number of hours that were actually worked. These allegations of fraud provide the government with enough knowledge of essential facts of the scheme to discover related fraud. The government would likely investigate billing practices across the company, because *Duprey* notes that the official national policy was to bill correctly but that the employees were consistently instructed not to do so.

Carter seeks to distinguish his action by pointing out that the other relators worked in different divisions and were truck drivers, whereas he was a ROWPU employee. We are unpersuaded that these distinctions are material. *Duprey* and the Texas action both allege a broad scheme that encompasses the time and location of Carter's action. Even though the fraud did occur via different types of employees and in different divisions, this is insufficient to demonstrate that the scheme Carter alleges is different from the one *Duprey* and the Texas relators allege. As the Fifth Circuit noted, "a relator cannot avoid § 3730(b)(5)'s first-to-file bar by simply adding factual details or geographic location to the essential or material elements of a fraud claim . . . ." *Branch Consultants*, 560 F.3d at 378. Here the fraud alleged—submission of false time sheets in support of claims for false payment—is the same in all of the complaints. Thus, Section 3730(b)(5)'s goal of preventing parasitic qui tam lawsuits would not be furthered if all

three actions were allowed to proceed on the same essential claims.

## D.

Carter argues that regardless of the relatedness of his complaint to the other cases, the other cases cannot continue to have a preclusive effect on his action. Carter argues that because the *Duprey* and Texas action have been dismissed neither can be deemed a "pending action" under § 3730(b)(5).

Following the plain language of the first-to-file bar, Carter's action will be barred by *Duprey* or the Texas action if either case was pending when Carter filed suit. The *Duprey* action was filed in 2007, and voluntarily dismissed in October 2011, after the relator failed to serve the complaint on the defendants. The Texas action was filed in 2007 and voluntarily dismissed in March 2012, when the government declined to intervene. Therefore, both actions were pending when Carter filed his complaint on June 2, 2011. Because we look at the facts as they existed when the claim was brought to determine whether an action is barred by the first-to-file bar, we conclude that Carter's claims are barred by the *Duprey* and Texas actions. However, this does not end our inquiry.

Carter alleges that the district court erred when it dismissed his complaint with prejudice on the ground that his action was forever barred by the *Duprey* action. In *United States ex rel. Chovanec v. Apria HealthCare Group, Inc.*, 606 F.3d 361, 365 (7th Cir. 2010), the Seventh Circuit reviewed a complaint that was dismissed with prejudice because of a pending case. The court reasoned that once the initial complaint was no longer pending, the bar of § 3730(b)(5) was inapplicable and Chovanec was "entitled to file a new *qui tam* complaint." *Id.* at 365. However, if a case is brought while the original case is pending it must be dismissed "rather than left on ice." *Id.* at 362. Although the doctrine of claim preclusion may prevent the filing of subsequent cases, § 3730(b)(5) does not. This is

especially true when the original case is dismissed on reasons other than the merits or dismissed without prejudice. *Id.* at 362. Because Chovanec was entitled to file a new complaint, the proceeding should have been dismissed without prejudice. *Id.* at 365.

Similarly the Tenth Circuit has explained why an action that is no longer pending cannot have a preclusive effect for all future claims. *In re Natural Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 963-64 (10th Cir. 2009). The court reasoned, "if that prior claim is no longer pending, the first-to-file bar no longer applies." *Id.* at 964. "The 'pending' requirement much more effectively vindicates the goal of encouraging relators to file; it protects the potential award of a relator while his claim remains viable, but, when he drops his action another relator . . . may pursue his own." *Id.*

We agree that once a case is no longer pending the first-to-file bar does not stop a relator from filing a related case. In this case, both of the original actions have been dismissed. Because of this, the first-to-file bar does not preclude Carter from filing an action. The first-to-file bar allows a plaintiff to bring a claim later; this is precisely what a dismissal without prejudice allows a plaintiff to do as well. Therefore, Carter's only impediment at the moment is the district court's dismissal with prejudice. And, as we have already concluded the district court erred in dismissing Carter's complaint with prejudice.

## V.

KBR argues that this Court should affirm the dismissal of Carter's complaint on the alternative ground of the FCA's public disclosure provision. As noted previously, the public disclosure bar removes subject matter jurisdiction for FCA claims that are based upon matters that have been disclosed publicly, unless the relator was the original source of the allegations. KBR alleges that Carter was not the original source

of the information, and that he gathered the information from another KBR employee. The district did not reach this argument, having found grounds for dismissal elsewhere. We decline to address this issue for the first time on appeal. Because the district court should have the opportunity in the first instance to address the facts relevant to public disclosure, we remand this issue to the district court.

## VI.

For the foregoing reasons we reverse the district court's dismissal of Carter's complaint. Rather than address the alternative ground of the public disclosure bar for the first time on appeal, we remand this issue to the district court for further consideration.

*REVERSED AND REMANDED*

WYNN, Circuit Judge, concurring:

I fully concur in the fine majority opinion. I write separately to address what appears to be the heart of the dissent's objections: that applying the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287, to the False Claims Act, 31 U.S.C. §§ 3729-33, actions in which the United States is not plaintiff or intervenor is unwise because doing so is contrary to the policy of strictly construing statutes of limitations and the goals of the False Claims Act. In particular, the dissent expresses concern that our decision will allow the False Claims Act limitations period to "extend indefinitely" and, consequently, will incentivize private plaintiffs to delay filing their claims to maximize their potential recovery. *Post* at 38 n.6, 38-39. Because it is not our place to second-guess Congress's clearly expressed policy decisions, I respectfully disagree with the dissent.

When interpreting a federal statute, the "cardinal rule . . . is that the intent of [Congress] is to be given effect." *NLRB*

*v. Wheeling Elec. Co.*, 444 F.2d 783, 787 (4th Cir. 1971). Typically, we ascertain Congressional intent from the plain language of the statute. *Id.* If the plain language of the statute unambiguously expresses Congress's intent, our inquiry comes to an end, even if we disagree with the policy embraced by the statutory language. *In re Sunterra Corp.*, 361 F.3d 257, 269 (4th Cir. 2004). For, as the Supreme Court has explained,

> Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto.

*Tenn. Valley Authority v. Hill*, 437 U.S. 153, 194-95 (1978).

Here, as the majority correctly concludes and the dissent tacitly acknowledges, the plain language of the Wartime Suspension of Limitations Act extends the limitation period for "any offense" of fraud against the United States during a time of war. 18 U.S.C. § 3287. No doubt recognizing that it is not our role to question Congress's clearly expressed policy determinations, the dissent relies on strained readings of the Wartime Suspension of Limitations Act and our precedent in an attempt to argue that, under the plain language of the Wartime Suspension of Limitations Act, the term "any offense" does not encompass False Claims Act actions in which the government is not a party.

First, the dissent appeals to our decision in *United States ex rel. Sanders v. North American Bus Industries, Inc.*, in which we held that the False Claims Act limitations period tolling provision, 31 U.S.C. § 3731(b)(2), does not apply to False Claims Act actions in which the government is not a party. 546 F.3d 288, 293. Section 3731(b)(2) provides that the stan-

dard six-year False Claims Act limitations may be tolled until "no more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." In *Sanders*, we reasoned that Section 3731(b)(2) does not toll the limitations period for private False Claims Act actions because it would make little sense to have a suit's limitations period turn on the knowledge of an entity that is not party to the action. 546 F.3d at 293.

The majority opinion correctly notes that *Sanders* is inapposite because it involved an entirely different statute, which includes express language that supports distinguishing between False Claims Act actions where the government is and is not a party. *Ante*, at 13-14. Nevertheless, the dissent tries to analogize the Wartime Suspension of Limitations Act to Section 3731(b)(2), which was at issue in *Sanders*, by asserting that federal government conduct controls the limitations periods set out in both statutes. In particular, the dissent notes that

> [b]y the terms of the [Wartime Suspension of Limitations Act], the government is solely entitled to invoke and terminate the tolling provisions of the statute . . . . The private *qui tam* plaintiff has no connection with these decisions and it seems odd to conclude that such a private plaintiff should be entitled to the same limitations period as the necessary actor, the government. There is no such clear statutory direction.

*Post* at 33. But Congress does not "invoke" the Wartime Suspension of Limitations Act. Rather, the Wartime Suspension of Limitations Act becomes effective when Congress declares war or authorizes the use of military force. The invocation of the Wartime Suspension of Limitations Act is at most a tertiary consideration in Congress's decision to declare war or

authorize the use of military force, and thus there is only a de minimus relationship between the government conduct discussed in the Wartime Suspension of Limitations Act and any particular False Claims Act claim. By contrast, with Section 3132(b)(2) the connection between the relevant government conduct and a particular False Claims Act claim is quite close, because whether Section 3132(b)(2) tolls the limitations period turns on the government's knowledge of the alleged fraudulent conduct at issue in the particular False Claims Act claim.

The dissent also places great weight on the fact that both the Wartime Suspension of Limitations Act and its legislative history are silent regarding *qui tam* relators in False Claims Act actions, arguing that this silence "strongly suggests that Congress did not intend the tolling provisions of the statute to reach indiscriminately to any private plaintiff pursuing a claim for fraud against the government." *Post* at 37, 39. Yet the Supreme Court has admonished courts to tread carefully in attempting to find meaning in statutory silence because such silence is frequently amenable to multiple interpretations:

> Not every silence is pregnant. In some cases, Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective. An inference from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.

*Burns v. United States*, 501 U.S. 129, 136 (1991) (quotation omitted), abrogated on other grounds by *United States v. Booker*, 543 U.S. 220 (2005). Here, finding meaning in the Wartime Suspension of Limitations Act's silence is improper because the silence just as reasonably can be interpreted as

indicating that Congress did not intend to distinguish between False Claims Act actions by private plaintiffs and those in which the government is a party as it can be interpreted as excluding actions by private relators from the ambit of the Wartime Suspension of Limitations Act, as the dissent does.

Moreover, Congress's decision not to clarify the scope of "any offense" when amending the Wartime Suspension of Limitations Act in 2008 in the face of numerous decisions broadly interpreting "offense" in the Wartime Suspension of Limitations Act casts further doubt on the dissent's appeal to statutory silence. A canon of statutory construction is that "[w]e presume that when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation." *Porter v. Bd. of Trustees of Manhattan Beach Unified School Dist.*, 307 F.3d 1064, 1074 (9th Cir. 2002); *see also United States v. Langley*, 62 F.3d 602, 605 (4th Cir. 1995) ("It is firmly entrenched that Congress is presumed to enact legislation with knowledge of the law; that is with the knowledge of the interpretation that courts have given to an existing statute.").

Congress amended the Wartime Suspension of Limitations Act in 2008 to broaden its scope by lengthening the tolling period and clarifying that the statute applies to Congressional authorizations of the use of military force as well as declared wars. *See* Wartime Enforcement of Fraud Act, Pub. L. No. 110-417 § 855, *codified at* 18 U.S.C. 3287. Notably, the amendment did not in any way alter, narrow, or circumscribe the scope of the term "any offense." By the time of the 2008 amendment, numerous courts had held that the term "offense" in the earlier version of the Wartime Suspension of Limitations Act encompassed civil fraud claims, including False Claims Act cases, *see, e.g., United States v. Witherspoon*, 211 F.2d 858 (6th Cir. 1954); *United States v. BNP Paribas*, 884 F. Supp. 2d 589, 602-05 (S.D. Tex. 2012), and the only court to address whether the Wartime Suspension of Limitations Act applies to non-intervened False Claims Act actions had

determined that it did, albeit in dicta, *United States ex rel. McCans v. Armour & Co.*, 254 F.2d 90, 90 (D.C. Cir. 1958). We must presume that Congress was aware of these interpretations when it amended the Wartime Suspension of Limitations Act in 2008, and its decision not to amend the statute to exclude, or even discuss, False Claims Act actions, let alone non-intervened False Claims Act actions, in the face of this precedent suggests that it agreed with, or at least acquiesced in, these judicial decisions. In such circumstances, Congress's silence favors the majority's reading, rather than undermining it.

Thus, neither of the dissent's rationales for reading ambiguity into the plain language of the statute is persuasive. Therefore, we are left to conclude that when Congress said "any offense," it meant *any* offense, including offenses raised by private False Claims Act relators. Because the plain language of the Wartime Suspension of Limitations Act indicates that Congress intended the statute to apply to non-intervened False Claims Act actions, it is not our place to question the wisdom of this policy decision. *Hill*, 437 U.S. at 194-95.

Even if the plain language of the Wartime Suspension of Limitations Act would allow us to consider the policy concerns highlighted by the dissent—that our decision will "extend indefinitely" the limitations period for False Claims Act claims and will encourage would-be relators to delay filing their claims—I am not convinced that either concern is justified. First, the Wartime Suspension of Limitations Act tolls the limitations period for fraud actions for a bounded period of time: the time during which the country is at war or otherwise engaged in a military conflict. 18 U.S.C. § 3287. Moreover, even if the informal nature of modern military conflicts renders the limitations period established by the Wartime Suspension of Limitations Act somewhat less definite, it is within Congress's purview to determine that certain conduct is sufficiently egregious—such as defrauding the government during a time of war—that an extended or indefinite limitations

period is warranted. Indeed, Congress has elected to entirely do away with limitations periods for many federal crimes. *See* Charles Doyle, Cong. Research Serv., RL 31253, *Statutes of Limitation in Federal Criminal Cases: An Overview* 18-24 (2012).

Second, any concern that our holding will encourage relators to sit on their claims in order to maximize recovery is alleviated by the False Claims Act's public disclosure and first-to-file bars, which preclude a would-be relator from bringing a claim that is based on information that has already been publicly disclosed or that is "related" to a pending action. *See* 31 U.S.C. §§ 3720(e)(4), 3730(b)(5). Regardless of the applicability of the Wartime Suspension of Limitations Act, False Claims Act relators have an incentive to bring actions as early as possible to avoid having their claims dismissed under either of these two provisions.

In sum, the majority correctly concludes that the plain language of the Wartime Suspension of Limitations Act unambiguously encompasses False Claims Act actions in which the government is not a party. It is not this Court's—or any court's—place to revisit Congress's clearly articulated policy determinations, even when we feel they are unwise. If, after reviewing our decision, Congress agrees with the dissent that limiting the Wartime Suspension of Limitations Act to False Claims Act actions in which the government is a party is the best policy, it is free to amend the statute, as it did in 2008. Until that point, however, we are required to give effect to Congress' intent, as expressed through the plain and unambiguous language of the Wartime Suspension of Limitations Act, that the tolling applies to "any offense." *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S.Ct. 1605, 1624 (2010) ("To the extent Congress is persuaded that the policy concerns identified by the dissent require a recalibration of [a statute], it is, of course, free to amend the statute accordingly. . . . This court may not, how-

ever, read more into [a statute] than the statutory language naturally supports.").

AGEE, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority opinion that the "first-to-file" rule does not act as a barrier to Benjamin Carter's *qui tam* action against Halliburton, Kellogg Brown & Root, and Service Employees International (collectively "KBR"). However, I do not agree with the holding in the majority opinion, principally section III D, that the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287, tolls the six-year limitations period set forth in the False Claims Act ("FCA"), 31 U.S.C. § 3731(b)(1), when the United States is not the plaintiff or an intervenor. For that reason, I respectfully dissent from the majority opinion insofar as it would allow Carter to proceed on those of his claims that fall outside the six-year FCA limitations period.

I.

Pursuant to 31 U.S.C. § 3731(b)(1), a civil action under the FCA may not be brought more than six years after the date on which the alleged violation was committed. In this case, the vast majority of Carter's claims against KBR stem from violations that allegedly took place before May 1, 2005.[1] Pursuant to § 3731(b)(1), therefore, Carter had until May 1, 2011, to file his *qui tam* complaint against KBR for it to be deemed timely. The latest iteration of Carter's complaint, however, was not filed until June 2, 2011. Thus, absent tolling, in some form, the bulk of Carter's claims are barred by the FCA's lim-

---

[1]Carter alleges that KBR fraudulently submitted one voucher to the United States, totaling $673.56, on June 15, 2005. Because this was within six years of the filing of Carter's complaint in 2011, Carter's FCA claim related to that voucher is timely.

itations period because they did not take place within six years of the filing of the complaint.[2]

In 1942, Congress unanimously approved the first version of the WSLA, which temporarily suspended the statute of limitations in criminal contracting fraud cases arising out of the Second World War. *See* Act of August 24, 1942, 56 Stat. 747. Congress amended the WSLA in 1948, and the majority concludes that the effect of those amendments was to extend the reach of the WSLA to civil limitations periods, not merely those arising in the criminal fraud context. *See* Act of June 25, 1948, 62 Stat. 683, 828. The majority may be correct, but the issue is not without doubt.[3]

In 2011, at the time Carter filed his complaint, the WSLA provided:

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces . . . the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the

---

[2]In addition to seeking to avail himself of tolling pursuant to the WSLA, Carter argued before the district court and on appeal that he is entitled to the benefit of equitable tolling. Although observing that his equitable tolling claim was improperly before the court, the district court alternatively held that "Carter cannot show that the instant suit is untimely due to circumstances external to his own conduct, and equitable tolling is inappropriate." (J.A. 620 n.11). I agree with the district court that equitable tolling is unavailable to Carter.

[3]Because I would hold that the WSLA does not apply in this case, I would merely assume, without deciding, that the WSLA applies to civil actions generally.

negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency, shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress. For purposes of applying such definitions in this section, the term "war" includes a specific authorization for the use of the Armed Forces.

18 U.S.C. § 3287.[4]

Carter argues that, by operation of the WSLA, the FCA limitations period was suspended in 2005, at the time KBR submitted allegedly false claims to the United States for payment. Accordingly, Carter posits (and the majority opinion agrees) that the WSLA precludes KBR from asserting the

---

[4]The majority opinion does not reach the question of whether the pre- or post-2008 version of the WSLA applies to Carter's *qui tam* complaint. *Ante* at 9. If the WSLA applies to this case at all (and I believe that it does not), it seems most likely that the post-2008 version of the statute would apply. This is so because the amendments at issue concern the limitations period for FCA actions and not the underlying conduct at issue. *See Forest v. USPS*, 97 F.3d 137, 140 (6th Cir. 1996) (new statute of limitations has prospective application because it applies to the filing of a complaint, which occurred after the statute was enacted); *but see Chenault v. USPS*, 37 F.3d 535, 539 (9th Cir. 1994) ("[N]ewly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme.").

Thus, for purposes of this dissent, I will assume that if any version of the WSLA applies, it is the version as amended in 2008.

statute of limitations as a defense in this case. For reasons explained below, I do not agree with that construction of the WSLA.

## II.

### A.

This appeal presents a quintessential question of statutory interpretation, which we review de novo. *In re Maharaj*, 681 F.3d 558, 568 (4th Cir. 2012).

"As in all cases of statutory interpretation, our inquiry begins with the text of the statute." *Chesapeake Ranch Water Co. v. Bd. of Comm'rs of Calvert Cnty.*, 401 F.3d 274, 279 (4th Cir. 2005). "In that regard, we must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute . . . and our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *United States v. Bly*, 510 F.3d 453, 460 (4th Cir. 2007) (quoting *United States v. Hayes*, 482 F.3d 749, 752 (4th Cir. 2007) (omission in original)). "We determine the 'plainness or ambiguity of the statutory language . . . by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. Thompson–Riviere*, 561 F.3d 345, 354–55 (4th Cir. 2009) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (omission in original).

### B.

I note at the outset that no case has ever held (other than in dicta) that the WSLA applies to civil cases where the United States is not a plaintiff or intervenor in the *qui tam* action. In the only case in which a court suggested the WSLA did so apply, *United States ex rel. McCans v. Armour & Co.*, 146 F. Supp. 546 (D.D.C. 1956), the court's conclusion was

not the *ratio decendi* of the decision and was clearly dicta. In *McCans*, the relator brought a qui tam complaint against Armour & Co., a government contractor, alleging that Armour sold certain pork products to war procurement agencies at prices in excess of limitations set by Congress during World War II. Although the allegedly illegal sales were conducted between 1942 and 1943, the relator did not file her complaint until 1954. While the district court discussed the application of the WSLA tolling provisions to the relator's complaint, it concluded that the complaint was not timely filed, even if WSLA tolling were applicable. *Id.* at 551. Any discussion of WSLA tolling in *McCans* was thus clearly unnecessary to the district court's holding that the suit was untimely. Accordingly, the court's references to the WSLA's applicability to private plaintiffs is mere dicta. *See Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 373 (4th Cir. 2011) ("This additional observation was not necessary to the Court's resolution of the . . . issue that was the basis of its holding, and we therefore conclude that the observation is merely dicta."); *Bettius & Sanderson, P.C. v. Nat'l Fire Union Fire Ins. Co.*, 839 F.2d 1009, 1019 n.3 (4th Cir. 1988) (Murnaghan, J., concurring in part and dissenting in part) ("To reach out and decide what need not be decided is frequently denigrated as *dictum*.").

## C.

As there is no direct authority for application of the WSLA here, I find the reasoning in *United States ex rel. Sanders v. North American Bus Industries, Inc.*, 546 F. 3d 288 (4th Cir. 2008), a persuasive guide to our disposition of this issue. *Sanders* concerned the construction of 31 U.S.C. § 3731(b), the FCA's limitations provisions; the same statute providing the statute of limitations in this case. That statute provides that

[a] civil action under [the FCA] may not be brought-

> (1) more than 6 years after the date on which the violation of [the FCA] is committed, or
>
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b). The *Sanders* relator, whose complaint was filed beyond the six-year limitations period described in § 3731(b)(1), sought to avail himself of § 3731(b)(2), which runs the limitations period from the time the United States receives (or reasonably should receive) notice of the violation. We rejected that attempt.

Although we observed that § 3731(b) applied to "civil action[s]" under the FCA, we held that the language of § 3731(b)(2) could only be logically applied when referring to an action brought by the United States, not by a private relator. *Id.* at 294. In support of this holding we reasoned that "applying the statute's language to a relator's action makes no sense whatsoever. The government's knowledge of 'facts material to the right of action' does not notify the relator of anything, so that knowledge cannot reasonably begin the limitations period for a relator's claims." *Id.*

The *Sanders* court also made important observations about the practical effect of allowing a private relator to claim the benefit of a statutory limitations period intended for the benefit of the government. It noted that extending the limitations period for up to 10 years (the outer limit provided by

§ 3731(b)(2)) in the case of a private relator would create incentives contrary to the purposes of the FCA. *Id.* at 295. "[R]elators would have a strong financial incentive to allow false claims to build up over time before they filed, thereby increasing their own potential recovery." *Id.* Critically, the court went on to note that the relator's proposed construction would undermine the very purpose of the *qui tam* provisions of the FCA: "to combat fraud quickly and efficiently by encouraging relators to bring actions that the government cannot or will not." *Id.*

Following the reasoning of *Sanders* in the instant case, I agree with the holding of the district court that application of the WSLA to a suit brought by a private relator is inconsistent with the WSLA and its legislative history and would be contrary to the articulated goals of the FCA. Let me explain why that is so.

At first blush, Carter is correct that the WSLA applies to "any offense," involving fraud against the United States (obviously, when certain conditions are met). But to read "any offense" as encompassing actions by private relators is a superficial reading of the WSLA and fails to construe the statute in context. By the terms of the WSLA, the government is solely entitled to invoke and terminate the tolling provisions of the that statute, however, the text of the WSLA is entirely silent as to private relators. The triggering and terminating provisions of the WSLA are both related to and solely controlled actions of the United States government: declaration of war or congressional authorization for use of military force (to trigger) and congressional resolution or Presidential proclamation (to terminate). In either circumstance, Congress and the President possess the unique power to invoke the WSLA to toll the limitations period for fraud offenses: a period when the same government is thus released from a looming time bar to bring an FCA claim. The private *qui tam* plaintiff has no connection with these decisions and it seems odd to conclude that such a private plaintiff, absent a clear statutory direction,

should be entitled to the same limitations period as the necessary actor, the government. There is no such clear statutory direction.

In *Sanders*, we declined to find that the private party relator could latch onto the § 3731(b)(2) exception since the relator was neither mentioned in the statute or legislative history as authorized to do so. Similarly, here with the WSLA, we find no mention of the private party relator in the statute or its legislative history: again, an odd basis upon which to extend the tolling of a statute of limitations which is to be strictly construed. *See Bridges v. United States*, 346 U.S. 209, 215-16 (1953) (holding that, because the WSLA is an exception to the "longstanding congressional policy of repose," it is "to be liberally interpreted in favor of repose").

Simply reading "any offense" to encompass all offenses regardless of whether the United States is the plaintiff, is inconsistent with the nuanced approach that courts have employed when reading the "civil action" language in § 3731(b). We reasoned in *Sanders* that "a civil action" should not be read to encompass all FCA actions, but rather, should be read in context to include only those actions brought by the United States. *Sanders*, 546 F.3d at 294-95. Here, the WSLA (like § 3731(b)(2)) mentions the United States, not private relators. Thus the text of the WSLA, on its own, supports the proposition that only the United States may take advantage of its tolling provisions. Nevertheless, I also find that this interpretation is consistent with the purposes and legislative history of the WSLA.

### D.

The Supreme Court has described the rationale underlying the passage of the WSLA during World War II as follows:

> The fear was that the law-enforcement officers would be so preoccupied with prosecution of the war

> effort that the crimes of fraud perpetrated against the
> United States would be forgotten until it was too
> late. The implicit premise of the legislation is that
> the frenzied activities, existing at the time the Act
> became law, would continue until hostilities termi-
> nated and that until then the public interest should
> not be disadvantaged.

*United States v. Smith*, 342 U.S. 225, 228-29 (1952); *see also
id.* at 230 (Clark, J., concurring) ("Soon after the beginning of
World War II, Congress realized that it would be impossible
for the Department of Justice currently to investigate and
prosecute the large number of offenses arising out of the war
effort. Therefore Congress suspended the running of the stat-
ute of limitations as to frauds against the Government . . . .
It is clear that Congress intended to give the Department more
time to apprehend, investigate, and prosecute offenses occur-
ring 'under the stress of present-day events' of the war.").

In other words, the Court recognized that the primary con-
cern motivating Congress in passing the WSLA was the abil-
ity of law enforcement to effectively police fraud against the
government during the fog of war. *See, e.g.*, 21 Am. Jur. 2d
*Criminal Law* § 264 (2013) ("The purpose of the [WSLA] is
to give *government law enforcement officials* additional time
to discover and punish offenses related to the commercial
aspect of war programs, where extensive war efforts render
them unable to deal with those offenses within the normal
period of limitation." (emphasis added)). This concern is evi-
dent in the WSLA's legislative history.

> During normal times the present 3-year statute of
> limitations may afford the Department of Justice suf-
> ficient time to investigate, discover, and gather evi-
> dence to prosecute frauds against the Government.
> The United States, however, is engaged in a gigantic
> war program. Huge sums of money are being
> expended for materials and equipment in order to

carry on the war successfully. Although steps have
been taken to prevent and to prosecute frauds against
the Government, it is recognized that in the varied
dealings opportunities will no doubt be presented for
unscrupulous persons to defraud the Government or
some agency. These frauds may be difficult to dis-
cover as is often true of this type of offense and
many of them may not come to light for some time
to come. The law-enforcement branch of the Gov-
ernment is also busily engaged in its many duties,
including the enforcement of the espionage, sabo-
tage, and other laws.

*Bridges*, 346 U.S. at 217 n.18 (quoting S. Rep. No. 1544, 77th
Cong. 2d Sess). Once again, the concern of Congress, as
expressed in the legislative history, was the inability of the
Department of Justice and other federal law-enforcement enti-
ties to effectively prevent and prosecute fraud in light of other
duties antecedent to waging war. The legislative history
makes no mention of private plaintiffs bringing relator actions
against those allegedly engaged in fraud.

The legislative history of the Wartime Enforcement of
Fraud Act of 2008 ("WEFA"), Pub. L. No. 110-417 § 855,
which contained the most recent amendments to the WSLA,
reveals that the same concerns motivated Congress in passing
the 2008 amendments to the WSLA. In sending the WEFA to
the full Senate, the Judiciary Committee report repeatedly
emphasized the difficulty of investigators, auditors, and the
Department of Justice in ferreting out fraud against the United
States during the conflicts in Iraq and Afghanistan. *See* S.
Rep. No. 110-431. Again, the legislative history is silent with
respect to private party relators.

The purpose of the WSLA (as articulated by the Supreme
Court) and the legislative history of that statute confirm what
the text reflects: that Congress was concerned with the ability
of the federal government to police fraud when the resources

of its law enforcement were stretched thin by war. Tolling afforded law enforcement the ability to thoroughly investigate allegations of fraud without compromising the ability of the United States to fulfill its military mission. Unlike federal law enforcement, private relators are not "busily engaged in . . . many duties, including the enforcement of the espionage, sabotage, and other laws." *Bridges*, 346 U.S. at 217 n.18 (quoting S. Rep. No. 1544). And extending the benefits of tolling to private relators does not "afford the Department of Justice sufficient time to investigate, discover, and gather evidence to prosecute frauds against the Government." *Id.* In sum, Congress has shown no intent to toll the FCA's limitations period when the United States is not a plaintiff to the FCA action.

The complete silence as to relators in the legislative history of the WSLA is all the more telling when one considers that the FCA, which was originally passed in 1863, was on the books when the Congress considered the WSLA in 1942 and the WEFA in 2008. "Faced with statutory silence, we presume that Congress is aware of the legal context in which it is legislating." *Palisades Collections LLC v. Shorts*, 552 F.3d 327, 334 n.4 (4th Cir. 2008) (quoting *Progressive W. Ins. Co. v. Preciado*, 479 F.3d 1014, 1017-18 (9th Cir. 2007) (internal alterations omitted). Thus, the fact that Congress did not mention *qui tam* plaintiffs in the legislative history of any version of the WSLA strongly suggests that Congress did not intend for the tolling provisions of that statute to reach indiscriminately to any private plaintiff pursuing a claim for fraud against the government.

E.

Looking finally to the policies underlying the FCA, the majority's interpretation of the WSLA is plainly at odds with the goals of the FCA. The policy concerns underlying the FCA will be directly thwarted by allowing private relators to take advantage of the WSLA's tolling provisions. In this case, for example, Carter's claims arose in 2005, and application of

the WSLA would extend the limitations period for his actions well into the next decade at least, depending on the date hostilities in Iraq are deemed terminated. Assuming for the sake of argument, as the district court did, that the August 31, 2010, presidential statement of "the end of our combat mission in Iraq" was sufficient to end the tolling provisions of the WSLA,[5] (J.A. 628 n.33.), Carter would have until 2019, nearly fourteen years after his claims accrued, to file a *qui tam* action. Before the district court, Carter argued that hostilities in Iraq have not formally ended, meaning that the limitations period would still be tolled today, seven years after the allegedly false claims were presented to the government. When (and if) hostilities are formally declared terminated in Iraq, it could be up another eleven years (five years after termination of hostilities pursuant to the WSLA, plus the normal six year limitations period prescribed in § 3731(b)(1)) before the limitations period would be deemed to have ended.[6] Such an expansive limitations period applicable to private *qui tam* plaintiffs is unsupported by statute, legislative history, or precedent.

In this respect, *Sanders* is again instructive, because it accurately described the differing incentive structures that motivate relators, as opposed to law enforcement, in the context of FCA actions. As *Sanders* explained, a lengthy limita-

---

[5]It is not clear that this declaration meets the statutory prerequisites to end tolling as a matter of law, given the requirement contained in the WSLA that the President give formal notice to Congress that hostilities are terminated. *See* 18 U.S.C. § 3287.

[6]The majority opinion criticizes the district court for opining that the adoption of Carter's construction of the WLSA could permit the statute of limitations "to extend perhaps indefinitely." *Ante* at 14. But it is clear from the WSLA itself that tolling will continue until either the President makes a proclamation of termination of hostilities with formal notice to Congress, or Congress passes a concurrent resolution to the same effect. The record does not conclusively reflect that either Congress or the Chief Executive have acted in the manner contemplated by the statute. If they have not done so, tolling will indeed extend indefinitely.

tions period would create a "strong financial incentive" for relators to "allow false claims to build up over time before they filed, thereby increasing their own potential recovery." *Sanders*, 546 F.3d at 295. The government, on the other hand, always has an incentive to quickly act to root out fraud against the United States. The lengthy limitations period of the WSLA, therefore, is uniquely helpful to a government that is otherwise hampered from enforcing anti-fraud laws by the externalities of waging a military conflict. Applying that same lengthy limitations period to relators is uniquely problematic because doing so thwarts the whole purpose of the FCA: "to combat fraud quickly and efficiently by encouraging relators to bring actions that the government cannot or will not—to stimulate actions by private parties should the prosecuting officers be tardy in bringing the suits." *Id.* (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 547 (1943)) (internal quotation marks omitted).

In fact, the concern identified by *Sanders* is exacerbated in the context of wartime enforcement of anti-fraud laws. As the legislative history to the WEFA notes, "often," during war, "the Government does not learn about serious fraud until years after the fact." S. Rep. No. 110-431. In contrast, private party relators will be inclined to delay, allowing their potential recovery to increase, knowing that the government is unlikely to discover the fraud, and therefore unlikely to be the first to bring a claim against the perpetrators. Absent WSLA tolling, relators are at least restricted to a six year window in which to bring their claims. In the context of virtually indefinite WSLA tolling, however, a relator could wait a decade or more to bring a *qui tam* claim, secure in the knowledge that law enforcement is otherwise too occupied with the exigencies of war to discover the fraud on its own.

### F.

The majority opinion does not address the arguments set forth above, but summarily dismisses *Sanders* as inapplicable

because, "whether the suit is brought by the United States or a relator is irrelevant to this case because the suspension of limitations in the WSLA depends on whether the country is at war and not who brings the case." *Ante* at 14. This is a misreading of *Sanders*, the statute, and the legislative history. Like the WSLA, the limitations period at issue in *Sanders* did not contain an express limitation on who could take advantage of the tolling provision. Rather, the analysis in *Sanders* focused on whether § 3731(b)(2) could be plausibly read to encompass actions brought by private parties. Like § 3731(b)(2) in *Sanders*, the WSLA should be read in context, keeping in mind both the purposes of that statute and the dire effects of extending to relators a provision obviously intended only for the government.

## III.

The text, the purposes, and the legislative history of the WSLA all counsel in favor of holding that the government only, and not private relators, are entitled to take advantage of that statute's tolling provisions. Because the majority takes the altogether novel step of expanding the WSLA to apply to actions by relators, I must respectfully dissent from that aspect of the majority's holding.